The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 18, 2024

## 2024COA8

**No. 22CA2120, *Wolven v. del Rosario Velez* — Torts — Personal Injury; Creditors and Debtors — Health-care Provider Liens — Assignment — Not Admissible as Evidence**

In this personal injury action, the defendant appeals the trial court's decision to exclude evidence of the plaintiff's health-care provider lien from trial per section 38-27.5-103(2), C.R.S. 2023, arguing that because the lien was amended to comply with the statute shortly before trial, it did not meet the statutory requirements. A division of the court of appeals concludes, as a matter of first impression, that so long as a health-care provider lien agreement conforms with the statute when it is created or amended, it must be excluded from trial per section 38-27.5-103(2).

The division also holds that the trial court's admission of the plaintiff's expert testimony concerning an "impairment rating," as

calculated using the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (5th ed. 2001), was proper, and it agrees with another division of this court's decision to admit such evidence in *Herrera v. Lerma,* 2018 COA 141.  The division also holds that the trial court properly denied defendant's request for a limiting instruction informing the jury how impairment ratings differ in personal injury and worker's compensation cases. Therefore, it affirms.

Court of Appeals No. 22CA2120
Jefferson County District Court No. 21CV30399
Honorable Russell Klein, Judge

Cory Wolven,

Plaintiff-Appellee,

v.

Jeanmadi del Rosario Velez,

Defendant-Appellant.

JUDGMENT AFFIRMED
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Schutz and Berger*, JJ., concur

Announced January 18, 2024

Cheney Galluzzi & Howard, LLC, Timothy C. Galluzzi, Kevin B. Cheney,
Denver, Colorado, for Plaintiff-Appellee

Baker & Hostetler LLP, Casie D. Collignon, Keeley O. Cronin, Matthew T.
Schock, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2023.

¶ 1     Defendant, Jeanmadi del Rosario Velez, appeals the trial court's order of judgment and jury verdict against her and in favor of plaintiff, Cory Wolven, awarding Wolven $1,953,443.00 in damages. We affirm and remand with directions.

## I.    Background

¶ 2     On September 26, 2019, Velez failed to stop at a stop sign in Wheat Ridge, Colorado, and collided with Wolven's vehicle. After the accident, Wolven was diagnosed with several long-term spinal and neck injuries that she attributes to the crash. Wolven sued Velez for these injuries on April 8, 2021, and a jury found in Wolven's favor on October 13, 2022.

¶ 3     The jury awarded Wolven $450,264.00 for noneconomic and injury losses, $500,000.00 for economic losses, and $1,003,179.00 for physical impairments, for a total award of $1,953,443.00.[1]

---

[1] The trial court totaled the jury verdict as $1,954,443.00, but by our calculation the jury's verdict totals $1,953,443.00. Wolven also mistakenly stated that the jury verdict was for $1,945,443.00 in her October 18, 2022, "Motion to Tax Interest and Enter Judgment," a figure the trial court then mistakenly used in its order granting the motion. We note below that this issue needs to be corrected on remand.

Velez now challenges the jury's verdict and the trial court's order entering judgment against her.

¶ 4     On appeal, Velez raises three issues for review. First, Velez contends that the trial court erred when it allowed Wolven's expert to testify about Wolven's 8% "whole person permanent impairment rating," calculated using the American Medical Association (AMA) *Guides to the Evaluation of Permanent Impairment* (5th ed. 2001) (AMA Guides). Velez contends that the AMA Guides' use is improper here because section 8-42-107(8)(b.5)(I)(A), (b.5)(II), C.R.S. 2023, requires the third edition of the AMA Guides to be used in Colorado workers' compensation cases, and that the AMA Guides are irrelevant and therefore inadmissible in cases outside the worker's compensation context.

¶ 5     Second, Velez contends that the trial court should have issued a limiting instruction informing the jury how impairment ratings are calculated, or about their use in workers' compensation cases, and that without such an instruction the jury could not reliably calculate Wolven's damages.

¶ 6     Third, Velez contends that the trial court erred by retroactively applying section 38-27.5-103(2), C.R.S. 2023, to exclude evidence of

2

Wolven's health-care provider lien from trial, despite the lien's pretrial amendment to conform with the statute.

¶ 7    We reject these contentions, remand for correction of the judgment amount consistent with this opinion, and otherwise affirm.

## II.    Preservation

¶ 8    "[I]ssues not raised in or decided by a lower court will not be addressed for the first time on appeal." *Melat, Pressman & Higbie, L.L.P. v. Hannon L. Firm, L.L.C.*, 2012 CO 61, ¶ 18.  To preserve an issue for appeal, an appellant, during trial, must raise it in a manner specific enough that it "draws the [trial] court's attention to the asserted error." *People v. McFee*, 2016 COA 97, ¶ 31.  Velez's first two contentions were preserved by specific objections, and the third by a pretrial motion.

## III.    Standard of Review

¶ 9    We review a trial court's decision to admit or exclude evidence for an abuse of discretion.  *Hall v. Frankel*, 190 P.3d 852, 858 (Colo. App. 2008).  We will only overturn the judgment of the trial court as an abuse of its discretion if the decision was "manifestly arbitrary, unreasonable, or unfair."  *Id.*; *see also People v. Destro*, 215 P.3d

1147, 1152 (Colo. App. 2008) ("A trial court has broad discretion to determine the admissibility of expert testimony pursuant to CRE 702, and we will not overturn its ruling absent an abuse of that discretion."). "Whether the court misapplied the law in making evidentiary rulings is reviewed de novo." *Bd. of Cnty. Comm'rs v. DPG Farms, LLC*, 2017 COA 83, ¶ 34.

¶ 10    We also review de novo whether a trial court's jury instructions correctly informed the jury of the law. *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). If the trial court's instructions were an accurate statement of the law, "we review a trial court's decision to give a particular jury instruction for an abuse of discretion." *Id.* "[A] trial court has broad discretion to determine the form and style of jury instructions." *Id.* Thus, a trial court only abuses its discretion when deciding whether to provide a particular jury instruction when the ruling is "manifestly arbitrary, unreasonable, or unfair." *Id.*

## IV.  Analysis

### A.  The Trial Court Properly Admitted the Impairment Rating Evidence Based on the AMA Guides

¶ 11    Velez's first argument is that the trial court erred by admitting Wolven's expert's testimony concerning Wolven's "whole person permanent impairment" rating, derived from the AMA Guides, because the AMA Guides' impairment ratings are only relevant in the workers' compensation context.  To this end, Velez asks that we decline to follow another division of this court's holding on this issue in *Herrera v. Lerma*, 2018 COA 141.  Because we find the reasoning in *Herrera* persuasive, we reject Velez's contention.

### 1.  Relevant Facts

¶ 12    After he was admitted as an expert in "physical medicine and rehabilitation," Dr. Lee Moorer testified about the AMA Guides' impairment rating for Wolven.  Because Wolven hired him to conduct an independent medical evaluation, Dr. Moorer testified extensively about the examinations he performed.  This included, for example, reviewing Wolven's medical history and her medical imaging results, assessing her neck's possible range of motion, assessing Wolven for damaged spinal ligaments and conducting

orthopedic ligament testing, and verifying that Wolven was not "faking" her injuries.

¶ 13    Dr. Moorer's examinations led him to conclude that Wolven had suffered various injuries, including a torn alar ligament, spinal disc bulges and herniations, and cervical facet injuries. Dr. Moorer's diagnosis was for "cervical instability," damage to cervical ligaments, and "cervicogenic headaches." He also concluded that Wolven would suffer a "permanent impairment" and would not return to her "pre-crash health status."

¶ 14    When Wolven's counsel asked whether there were "standardized guidelines" for measuring permanent impairment, Dr. Moorer then provided testimony on the AMA Guides' impairment ratings, over Velez's objection. Dr. Moorer testified that the AMA Guides are released by the AMA and routinely updated, and that he used the fifth edition of the AMA Guides to conclude that Wolven had an 8% "whole person permanent impairment," based on her "pain and loss of range of motion."

¶ 15    On cross-examination, Velez's counsel inquired about the impairment rating and how it was calculated. This included asking Dr. Moorer to explain that the AMA Guides are typically used in

workers' compensation cases, which are administrative proceedings. Velez's counsel then discussed at length Dr. Moorer's examinations, the medical imaging he reviewed, and his expectations for Wolven's future care. Velez's counsel also asked if most doctors use the third edition of the AMA Guides in workers' compensation cases, and Dr. Moorer said that, at least when he was doing workers' compensation cases, he believed this was correct.

¶ 16    On redirect, in response to cross-examination about the AMA Guides' use in workers' compensation cases, Wolven's counsel asked Dr. Moorer to read an excerpt of text to the jury. The excerpt included an explanation by the AMA that the AMA Guides were intended to be used as a tool for medical practitioners to "rate impairment to assist adjudicators and others in determining the financial compensation" awarded to injured individuals and that they have applications in contexts outside of workers' compensation, like personal injury cases.

¶ 17    The AMA Guides were later discussed during cross-examination of Velez's expert witness, Dr. Gretchen Brunworth. Wolven's counsel revisited Dr. Brunworth's testimony that she

7

believed Wolven had a "good range of motion in her cervical spine," by probing the basis of this conclusion. Dr. Brunworth confirmed that she had "eyeballed" Wolven's possible range of motion and could do so because of her professional experience, but she had not used a specific tool (such as an "inclinometer") to reach this conclusion.

¶ 18 Wolven's counsel then asked if she was aware that the AMA Guides prefer inclinometers for range of motion testing because it can be difficult to assign standardized values for a person's impairment. Dr. Brunworth responded that this was true, but she was unsure how helpful the AMA Guides would be outside of workers' compensation cases. Dr. Brunworth later agreed with Dr. Moorer's prior testimony that, under the AMA Guides, Wolven had an 8% permanent impairment rating.[2]

¶ 19 On redirect, Velez's counsel also questioned Dr. Brunworth to clarify that an impairment rating is used to derive a figure for

---

[2] Wolven's counsel asked Dr. Brunworth if she agreed that the 8% impairment rating from the sixth edition of the AMA Guides was accurate, while Dr. Moorer testified that he used the fifth edition.

settlements in workers' compensation cases, which do not include compensation for pain and suffering.

## 2.     Analysis

¶ 20     *Herrera v. Lerma* dealt with a very similar issue to the contention in this case.  2018 COA 141.  There, the plaintiff's vehicle was struck from behind, causing the plaintiff neck and back pain, so the plaintiff filed a personal injury lawsuit.  *Id.* at ¶¶ 2-4. The plaintiff's expert witness determined that the plaintiff had a "permanent whole person impairment rating of 15%" based on the fifth edition of the AMA Guides.  *Id.* at ¶¶ 15-16.

¶ 21     The defense, much like in this case, argued the evidence should have been excluded because impairment ratings are irrelevant outside of workers' compensation cases.  *Id.* at ¶ 18.  The argument was grounded in the fact that, by statute, in workers' compensation cases, treating physicians must base their physical impairment ratings on testing required by the revised third edition of the AMA Guides.  § 8-42-107(8)(b.5)(I)(A), (b.5)(II); Am. Med. Ass'n, *Guides to the Evaluation of Permanent Impairment* (3d ed. 1988).

¶ 22    The *Herrera* trial court excluded the exact percentage of the rating, fearing it might be irrelevant and overly prejudicial, but it allowed the expert to testify that the plaintiff "had suffered permanent impairment according to the AMA Guides." *Herrera,* ¶ 16.  On appeal, a division of this court held that, "[s]imply because the workers' compensation statute requires using the AMA Guides in determining a workers' compensation claimant's medical impairment rating doesn't mean it necessarily excludes using an impairment rating in other types of personal injury claims." *Id.* at ¶ 18.

¶ 23    The division held that the expert's testimony was relevant because it "would've helped make the existence of plaintiff's claim of permanent medical impairment more probable by showing that a physician using the objective AMA guidelines had concluded not only that plaintiff was permanently impaired, but that the impairment could be quantified into a scientifically determined percentage." *Id.* at ¶ 19.  Put simply, because the evidence could have given the jury a "a concrete percentage on which it could base its verdict," the evidence was relevant, and the division could not discern how the evidence was irrelevant.  *Id.* at ¶¶ 19-20.

10

¶ 24    Furthermore, the *Herrera* division held that the evidence would not have been overly prejudicial, in violation of CRE 403, because the expert had testified about the purpose of the AMA Guides, how the rating was determined, and which version of the AMA Guides the expert used. *Id.* at ¶ 22. Additionally, the division concluded that the use of the AMA Guides in workers' compensation cases had "no bearing" on their use elsewhere and that explaining — rather than introducing confusion about — how the rating is calculated would only help the jury. *Id.* at ¶¶ 23-24. As a result, the division found that the trial court had abused its discretion by excluding the permanent impairment rating percentage. *Id.* at ¶ 25.

¶ 25    We find the reasoning in *Herrera* persuasive and hold that the impairment rating evidence based on the AMA Guides at issue here, admitted through an expert, was relevant and not unfairly prejudicial. CRE 403; *see also Sovde v. Scott,* 2017 COA 90, ¶ 24 ("Trial courts have broad discretion to admit or to exclude expert testimony . . . ."). Further, while section 8-42-107(8)(b.5) does require the use of the AMA Guides in workers' compensation cases, it does not prohibit the admission of AMA Guides evidence in cases

not involving workers' compensation, nor does any other Colorado statute.

¶ 26    The relevancy of the AMA Guides' impairment rating is the same here as it was in *Herrera* — the AMA Guides can provide a jury with a standardized rating for an injured individual's impairment, as determined by a medical professional. *Herrera,* ¶ 19. Thus, the AMA Guides can provide additional concrete information that may aid the jury's factfinding, and we perceive no reason why they might be irrelevant simply because a version of the AMA Guides is used in workers' compensation cases in Colorado.

¶ 27    This is particularly true where any disagreement about the AMA Guides' value, or an impairment calculation, can be contested through direct and cross-examination, as well as additional expert witnesses, to mitigate risks of prejudice. *See Ross v. Colo. Nat'l Bank of Denver,* 170 Colo. 436, 446, 463 P.2d 882, 887 (1969) ("It is fundamental that once a witness testifies as an expert, he subjects himself to the most rigid kind of cross-examination, including searching questions concerning his qualifications, the extent of his knowledge, and the basis of his opinion."). A jury is free to decide for itself what weight to give an expert's testimony. *See Murray v.*

*Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 23.  Indeed, the court explicitly instructed the jury that it could accept or reject any expert testimony.

¶ 28     Additionally, much like in *Herrera*, the jury here was presented with multiple pieces of testimony that highlighted the probative value of the AMA Guides evidence and provided context for the impairment rating.  This included what the AMA Guides are and who creates them, their use in workers' compensation cases, and which version Wolven's expert used.  Furthermore, the jury heard extensive direct and cross-examination testimony about the medical examinations and imaging that informed Wolven's expert's diagnoses and impairment rating decision, and his expert opinions.

¶ 29     The jury also learned how the AMA intended for the AMA Guides to be used and their potential applicability to fields other than workers' compensation.  Furthermore, Velez's expert witness also testified on cross-examination whether she thought the AMA Guides might apply to issues outside of workers' compensation.  And, had Velez wished, her counsel could have cross-examined Wolven's expert witness on the subject further.  Or she could have asked her own expert witness about the AMA Guides to further

highlight disagreements over their use.  But she largely failed to do so.

¶ 30    As a result, we find that the expert testimony concerning the AMA Guides' impairment rating at issue was relevant and its probative value outweighed its risk of unfair prejudice, in accordance with *Herrera*'s persuasive reasoning.  *See Herrera,* ¶¶ 19-24; CRE 403.  And the trial court did not abuse its discretion by relying on binding precedent to admit the evidence.  *See Hall,* 190 P.3d at 858; *Scott,* ¶ 24; C.A.R. 35(e) (Court of appeals "[o]pinions designated for official publication must be followed as precedent by all lower court judges in the state of Colorado.").

### B.    The Trial Court Properly Refused Velez's Proposed Jury Instruction

¶ 31    Velez next contends that the trial court erred by declining to provide a limiting instruction "on how impairment ratings work — specifically, how and why they are different in workers' compensation cases than they would be in personal injury cases." We disagree.

14

## 1.    Relevant Facts

¶ 32    Velez never proffered a specific jury instruction to the trial court detailing a proposed limiting instruction for the impairment rating evidence from the AMA Guides.  But, at trial, Velez's counsel noted for the court that "the physical impairment in a civil case is not the same thing as a physical impairment in a workers' compensation case."

¶ 33    Thus, Velez's counsel requested that the trial court explain in a jury instruction that the trial court had taken judicial notice of this, and that workers' compensation cases "do not have a category for noneconomic damages."[3]  The fear, Velez's counsel reasoned, was that because workers' compensation cases do not award noneconomic pain and suffering damages, the jury would be confused by the mention of pain and suffering damages in the same instruction as physical impairment damages.  Velez's counsel also requested that the trial court include a definition of "physical

---

[3] "The [Workers' Compensation] Act does not provide for compensation for non-economic damages, such as pain and suffering."  *Reliance Ins. Co. v. Blackford*, 100 P.3d 578, 580 (Colo. App. 2004).

impairment," but dropped this contention during trial.  The trial court denied both requests.

¶ 34    The accepted jury instructions did not define physical impairment and the damages instruction was modeled on Colorado Pattern Civil Jury Instruction 6:1, CJI-Civ. 6:1 (2023).  It detailed:

> Plaintiff, Cory Wolven, has the burden of proving, by a preponderance of the evidence, the nature and extent of her damages.  If you find in favor of the plaintiff, you must determine the total dollar amount of plaintiff's damages, if any, that were caused by the negligence of the defendant.
>
> In determining such damages, you shall consider the following:
>
> 1. Any noneconomic losses or injuries which plaintiff has had to the present time or which plaintiff will probably have in the future, including: physical and mental pain and suffering, inconvenience, emotional stress, and impairment of the quality of life.  In considering damages in this category, you shall not include actual damages for physical impairment, since these damages, if any, are to be included in a separate category.
>
> 2. Any economic losses or injuries which plaintiff has had to the present time, including: reasonable and necessary medical treatment expenses.
>
> 3. Any physical impairment.  In considering damages in this category, you shall not include damages again for losses or injuries already

16

> determined under either numbered paragraph
> 1 or 2 above.

### 2. Analysis

¶ 35    "As long as the instruction properly informs the jury of the law, a trial court has broad discretion to determine the form and style of jury instructions." *Day*, 255 P.3d at 1067.

¶ 36    In regard to defining physical impairment, note 9 to CJI-Civ. 6:1 explicitly states that "[t]he terms 'physical impairment' and 'disfigurement' are not expressly defined in section 13-21-102.5[, C.R.S. 2023,] or in any appellate decision." By our review, this remains true. Indeed, the Colorado Supreme Court chose not to provide a definition for "physical impairment" even when discussing the term at length, albeit without making a point that this was a conscious decision. *See Pringle v. Valdez*, 171 P.3d 624, 631 (Colo. 2007) (holding that physical impairment and disfigurement are a separate category of damages from noneconomic damages, though never defining physical impairment with any greater specificity); *Preston v. Dupont*, 35 P.3d 433, 441 (Colo. 2001) (stating that "[p]hysical impairment and disfigurement are often the most serious

17

and damaging consequences of a defendant's negligence or misconduct," without defining the terms further).

¶ 37     Thus, the trial court did not inaccurately inform the jury of the law by refusing to include an instruction defining physical impairment, particularly given trial courts' broad discretion concerning jury instructions.  *See Day*, 255 P.3d at 1067.  And it certainly did not abuse its discretion by refusing to define the terms when our supreme court and legislature have declined to do so as well.  *See id.*

¶ 38     As for whether the trial court should have provided a limiting instruction to the jury detailing how the AMA Guides calculate impairment ratings, there is no CJI-Civ. instruction available that could have informed the trial court on this issue, nor, again, did Velez propose one of her own.  Furthermore, we have identified no authority that indicates the trial court needed to provide such an instruction.  To the contrary:

> Despite a trial court's discretion as to jury
> instructions' form and style, we disfavor
> instructions emphasizing specific evidence.
> We have stated a trial court "has no duty to
> select all the salient points in the evidence,
> favorable and unfavorable, and specifically call
> them to the attention of the jurors," because

> such pointed instructions tend to confuse the
> jury and result in incorrect directives
> regarding evidentiary weight.

*Krueger v. Ary*, 205 P.3d 1150, 1157 (Colo. 2009) (quoting *Lowe v.*

*People*, 76 Colo. 603, 615, 234 P. 169, 174 (1925)).

¶ 39    Velez's requested limiting instruction, to the degree we can

infer its contents, would likely have been the kind of instruction

that could improperly bring a jury's attention to an evidentiary

issue and cause unnecessary confusion.

¶ 40    Velez's main point on this issue, that workers' compensation

cases do not allow noneconomic damages like pain and suffering,

was discussed only briefly during trial — particularly compared to

the direct and cross-examination testimony addressing how the

AMA Guides work and their use by Wolven's expert, as discussed

above.  Velez brought the damages contention up briefly with her

own expert witness, Dr. Brunworth, but only asked a single

question on the subject, and the jury declined to ask any questions.

And the point was briefly elaborated on during Velez's closing

argument, highlighting how workers' compensation cases utilize impairment ratings differently.[4]

¶ 41     For the trial court to then issue a separate limiting instruction detailing that the jury must consider that workers' compensation cases treat physical impairment damages differently than personal injury cases do — invoking a wholly different field of law not before the jury — would be irrelevant at best, and confusing at worst. And, importantly, such an instruction could improperly direct jurors to give more, or less, weight to the AMA Guides impairment evidence introduced at trial. *See Krueger*, 205 P.3d at 1157. Had Velez wished to further highlight her disagreements with the AMA Guides evidence, the proper way to address this would have been

---

[4] The main contention Velez raises on this point is that in workers' compensation cases, a claimant needs to be at "maximum medical improvement" (MMI) before their permanent disability and a settlement can be determined. *MGM Supply Co. v. Indus. Claim Appeals Off.*, 62 P.3d 1001, 1005 (Colo. App. 2002) ("MMI is . . . when any medically determinable physical or medical impairment as a result of injury has become stable and when no further treatment is reasonably expected to improve the condition. . . . Evaluation for permanent disability cannot precede the determination that the claimant has reached MMI."). Thus, Velez argues that a permanent impairment rating cannot be reliably calculated for Wolven where her MMI was not determined.

through direct and cross-examination and closing argument, rather than a jury instruction.

¶ 42 Finally, precedent explicitly dictates that physical impairment damages are a separate category of damages from noneconomic ones — as expressed in the final accepted instructions. In *Preston*, for example, the Colorado Supreme Court noted that, "[b]ecause damages for these injuries are often the most important in making the plaintiff whole, a separate category of damages for physical impairment and disfigurement is necessary and important." 35 P.3d at 441; *see Pringle*, 171 P.3d at 631 ("Our analysis of the common law and principles underlying our discussion in *Preston* that physical impairment and disfigurement constitute a separate category of damages from noneconomic damages stands.").

¶ 43 The trial court did not inaccurately convey the law to the jury by refusing Velez's requested limiting instruction — indeed it likely avoided improperly confusing the jury and conformed with precedent's demand that physical impairment damages be a separate damages category. *See Krueger*, 205 P.3d at 1157; *Pringle*, 171 P.3d at 631. Further, particularly given trial courts' broad discretion to determine the form and style of jury instructions,

21

along with the fact that the trial court's accepted instruction matched CJI-Civ. 6:1, the trial court did not abuse its discretion. *See Day*, 255 P.3d at 1067.

### C. The Trial Court Properly Excluded Evidence of Wolven's Health-Care Provider Lien

¶ 44 Velez lastly contends that the trial court erred when it excluded evidence of Wolven's health-care provider lien from trial per section 38-27.5-103(2). We disagree.

#### 1. Relevant Facts

¶ 45 After Wolven's car crash, she financed some of her medical care provided by the Centento-Schultz Clinic through a health-care provider lien with a company called Quantum Specialist Network (QSN). Wolven granted QSN a lien on any favorable judgments or settlements Wolven received in exchange for payment of her medical expenses. It is unclear from the record before us exactly when the original lien agreement between Wolven and QSN was finalized, but Wolven began receiving treatment from the Centento-Schultz Clinic, apparently billed to QSN, in March 2021.

¶ 46 On October 5, 2022, five days before Wolven's October 10 trial began, QSN and Wolven amended the lien agreement. The change

22

may have been made after QSN realized that it needed to amend the agreement to satisfy the disclosure requirements in section 38-27.5-104(1)(a)-(g), C.R.S. 2023, and to conform with the liability requirements of section 38-27.5-105(4), C.R.S. 2023.[5]

## 2.    Analysis

¶ 47    Colorado's "collateral source rule" originated in common law but is now codified in statute.  *Ronquillo v. EcoClean Home Servs., Inc.*, 2021 CO 82, ¶ 13; § 13-21-111.6, C.R.S. 2023; § 10-1-135(10)(a), C.R.S. 2023.  The rule seeks to ensure that a tortfeasor cannot attempt to reduce an injured party's damages at trial by using benefits the injured party receives from sources wholly independent of a tortfeasor (i.e., collateral source benefits) to remedy the tortfeasor's harms against the injured party.  *Ronquillo*, ¶ 13.

¶ 48    The "pre-verdict evidentiary" component of the rule, as relevant here and codified at section 10-1-135(10)(a), achieves this

---

[5] H.B. 21-1300, which enacted sections 38-27.5-101 to -108, went into effect on September 7, 2021.  *See* Ch. 473, secs. 1-2, §§ 38-27.5-101 to -108, 2021 Colo. Sess. Laws 3388-94 (bill went into effect ninety days after adjournment of the 2021 legislative session on June 8, 2021).

aim by requiring trial courts to exclude evidence of collateral source benefits from trial. *Ronquillo*, ¶¶ 14, 18 ("By excluding collateral source information entirely, the rule ensures that tortfeasors will not escape liability simply because the injured party had the foresight to obtain a benefits provider to offset the risk of unexpected medical expenses.").

¶ 49    In 2021, the Colorado legislature enacted sections 38-27.5-101 to -108, C.R.S. 2023, creating new rules for health-care provider liens. *See* Ch. 473, secs. 1, §§ 38-27.5-101 to -108, 2021 Colo. Sess. Laws 3388-94. Specifically, per section 38-27.5-103(2), all evidence related to the "amount paid by an assignee," "fact of the assignment," or "terms" of health-care provider liens created under section 38-27.5-103(1) are excluded from discovery and trial, akin to section 10-1-135(10)(a)'s exclusion of collateral source benefits, if a health-care provider or its assignee provides certain disclosures per section 38-27.5-104(1) before the lien is created and complies with section 38-27.5-105(4). Health-care provider liens that comply with the requirements of sections 38-27.5-104(1) and -105(4) "necessarily provide a benefit" to an injured party, akin to collateral

24

source benefits, and therefore are excludable from trial per section 38-27.5-103(2). *Ronquillo*, ¶ 33.

¶ 50    Here, the questions are not whether the amended QSN lien meets the requirements of section 38-27.5-105(4) and whether QSN provided the proper disclosures per section 38-27.5-104(1). Instead, the question is whether the amended QSN lien qualifies for the protections afforded by section 38-27.5-103(2) — despite being amended to comply with sections 38-27.5-104(1) and -105(4) just five days ahead of trial.

¶ 51    The trial court excluded the amended QSN lien agreement from trial, denying Velez's pretrial motion, because it found that section 38-27.5-103(2) effectively created a prospective rule of admissibility, and that the amended lien agreement met the statutory criteria. Thus, while the trial court had "some concerns" about the lien's last-minute amendment, because the amended lien complied with the requirements of sections 38-27.5-104(1) and -105(4), it was inadmissible at trial.

¶ 52    Velez contends that the trial court erred by granting the statutory protections of section 38-27.5-103(2) because when the original lien agreement was formed, it did not conform to the

disclosure requirements of section 38-27.5-104(1). Thus, Velez says, the trial court should not have, in effect, retroactively applied section 38-27.5-103(2). Wolven, in turn, contends that the amended lien complied with the requirements of sections 38-27.5-104(1) and -105(4) before it was created. Thus, even if created so close to trial, it was inadmissible at trial per section 38-27.5-103(2). We agree with Wolven and the trial court, and conclude that the application of section 38-27.5-103(2)'s protections did not require a retroactive application of the statute, and that evidence of the amended QSN lien was properly excluded.

¶ 53    Whether the amended QSN lien agreement was properly excluded at trial depends on whether it met the requirements of sections 38-27.5-104(1) and -105(4), and was therefore excludable under section 38-27.5-103(2). *See Ronquillo*, ¶ 33. The original lien agreement is irrelevant because it was superseded by the amended lien. The amended lien agreement explicitly detailed that it covered any unpaid services Wolven had received from QSN providers and any judgment or settlement arising from Wolven's September 26,

2019, crash.[6] *See Phx. Power Partners, L.P. v. Colo. Pub. Utils Comm'n*, 952 P.2d 359, 364 (Colo. 1998) (novation, and extinguishing an old contract and substituting a new one, need not be explicit and "may be inferred from facts and circumstances" if there was a previous valid contract and agreement to abide by a new valid contract that extinguished the old agreement).

¶ 54     The plain language of section 38-27.5-104(1) supports this interpretation and is the only section in article 27.5 that provides any, albeit limited, guidance on timing requirements for the

---

[6] Even if the amended lien agreement was not explicit about taking over any payments Wolven still owed for care resulting from the crash, the inherent inconsistency between two lien agreements covering judgments arising out of litigation for the same injury, with presumably contrasting repayment terms, would cause the amended lien agreement to implicitly supersede the original agreement. *See In re Estate of Gadash*, 2017 COA 54, ¶ 47 n.6 ("In order for a subsequent contract to implicitly supersede an earlier one, the two agreements must cover the same subject matter and be inconsistent with one another."). That said, however, the record before us only provides the amended agreement and the disclosures associated with it to demonstrate it conforms to sections 38-27.5-104(1) and -105(4), C.R.S. 2023, and we do not have the original agreement in the record before us to compare the agreements' terms. *See Schuster v. Zwicker*, 659 P.2d 687, 690 (Colo. 1983) ("It is the obligation of the party asserting error in a judgment to present a record that discloses that error, for a judgment is presumed to be correct until the contrary affirmatively appears."); *LePage v. People*, 2014 CO 13, ¶¶ 15-16.

creation of health-care provider liens. Section 38-27.5-104(1) notes that the required disclosures must be provided "[b]efore a health-care provider lien is created" for it to be compliant and entitled to section 38-27.5-103(2)'s protections. But this occurred here — before the amended QSN lien agreement was created, QSR gave Wolven the disclosures required by section 38-27.5-104(1). Thus, because the amended QSN lien complied with sections 38-27.5-104(1) and -105(4), it was excludable from trial per section 38-27.5-103(2). *See Ronquillo*, ¶ 33.

¶ 55 As a result, the trial court properly excluded evidence of the amended lien agreement from trial in accordance with section 38-27.5-103(2). We perceive no error, on de novo review, in the trial court's adherence to the plain language of the statute. *See DPG Farms*, ¶ 34.

¶ 56 We, however, share the trial court's concerns surrounding the last-minute amendment of the QSN lien agreement ahead of trial. Because section 38-27.5-104(1) and -105(4) compliant health-care provider liens are required to be excluded from trial and discovery per section 38-27.5-103(2), such last-minute changes could lead to gamesmanship. In affirming the trial court's decision to exclude

28

evidence of the amended QSN lien at trial, as required by statute, we in no way endorse plaintiffs changing lien agreements to comply with section 38-27.5-104(1) on the eve of trial. However, only the legislature may provide more specific timing rules to determine whether a health-care provider lien that has been amended to conform with section 38-27.5-104(1) is admissible at trial. *Dep't of Transp. v. City of Idaho Springs*, 192 P.3d 490, 494 (Colo. App. 2008) ("Courts may not rewrite statutes to improve them."). If a health-care provider lien, before it is created, complies with sections 38-27.5-104(1) and -105(4), then it is protected by section 38-27.5-103(2) and is excluded from discovery and trial.

## V.    Disposition

¶ 57    Because the trial court's October 13, 2022, "Order Regarding Verdict" mistakenly totals the jury's verdict to be $1,954,443.00, when by our calculation the award should in fact be for a total of $1,953,443.00, we correct this mistake with this opinion and remand to the trial court to recalculate Wolven's damages award. *See Bell v. McCann*, 535 P.2d 233, 235 (Colo. App. 1975) (not published pursuant to C.A.R. 35(f)) (appellate court may correct mathematical errors in trial court's damages award when supported

29

by the record); *see also* C.R.C.P. 60(a) (trial court may correct clerical errors in judgment on its own initiative or by motion from the parties at any time).

¶ 58    We affirm the jury verdict and the judgment of the trial court and remand the case with directions.

JUDGE SCHUTZ and JUDGE BERGER concur.