23CA0495 Peo In Interest of OP 07-03-2024 COLORADO COURT OF APPEALS Court of Appeals No. 23CA0495 El Paso County District Court No. 21JV106 Honorable Lin Billings Vela, Judge The People of the State of Colorado, Appellee, In the Interest of O.P., a Child, and Concerning K.P., Appellant, and Z.L., Appellee. JUDGMENT AFFIRMED Division IV Opinion by JUDGE JOHNSON Navarro and Pawar, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 3, 2024 Kenneth Hodges, County Attorney, Robert W. Kern Jr., Chief Deputy County Attorney, Colorado Springs, Colorado, for Appellee The People of the State of Colorado Josi McCauley, Guardian Ad Litem The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant K.P. 
 Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellee Z.L. 
 1 ¶ 1 In this dependency and neglect case, the district court was asked to determine the paternity of O.P. (the child) as it relates to K.P., the child’s biological father, and Z.L., the petitioner of the paternity action. Another man, J.H., did not assert a paternity claim, but he was awarded protective supervised custody of the child following the paternity adjudication. K.P. appeals the district court’s judgment that determined Z.L. to be the child’s legal father under the Colorado Uniform Parentage Act (UPA). We affirm. I. Background ¶ 2 The child was born in Arkansas in September 2015. Although S.L. (mother) was married to but separated from J.H at the time of the child’s birth, mother was in a relationship with K.P. It is undisputed that K.P. is the child’s biological father, as biological test results indicate a 99.99% DNA match between him and the child. And it is also undisputed that K.P.’s name is on the birth certificate.
1 1 Because the birth certificate is not in the record, the parties do not dispute that K.P.’s name is on the document, and the district court found that his name is on the document, we presume that this fact is supported by the record. See People v. Duran, 2015 COA 141, ¶ 21 (“Without an adequate record on appeal, we must presume that the court’s order was correct.”). 
2 ¶ 3 K.P., the child, and mother remained in Arkansas for approximately one year. The three then moved to California, where they lived for approximately ten months. Mother and K.P. then split up and each moved separately to Colorado. ¶ 4 In Colorado, mother began dating Z.L. in June 2017. In December 2017, Z.L. moved in with mother and started to take care of the child. Z.L. and mother married in December 2019 and remained together until September 2022, when they separated and Z.L. moved out.
2 ¶ 5 Mother and the child came to the attention of the El Paso County Department of Human Services (the Department) in November 2020 because of mother’s drug and alcohol abuse and her violent mistreatment of her children when intoxicated.
3 At first, the Department instituted a safety plan that required Z.L. to supervise mother with the child (and O.P.’s siblings). But the Department was dissatisfied with Z.L.’s compliance with the safety 2 The record does not indicate when mother and J.H. were divorced. 3 In addition to O.P., mother has three children with J.H., all of whom are older than O.P. Although the other children were part of the dependency and neglect action, only O.P.’s paternity is at issue in this appeal. 
3 plan as he continued to leave the children alone with mother when she drank. ¶ 6 As a result, the Department filed a petition in dependency or neglect in February 2021. The petition named Z.L. as a special respondent and K.P. as the biological father. The child was adjudicated dependent and neglected as to mother in March 2021. The Department did not serve K.P. with the petition until September 2021. ¶ 7 Once K.P. was served, he wanted the child to be returned to his care. K.P. requested reintegration therapy so that he could rebuild his relationship with the child. ¶ 8 In April 2022, Z.L. filed a motion in the dependency and neglect action requesting a determination that he was the child’s legal father. Z.L. argued that he was the child’s psychological father, as the child referred to him as “Dad,” he held the child out as his own, he had been in the child’s life for about five years, he was the only father the child had known, and it would be detrimental to the child to sever the relationship since “there is a clear bond and attachment to [Z.L.].” At the time Z.L. filed his paternity claim, the child was placed with Z.L.’s parents. 
4 ¶ 9 K.P. contested Z.L.’s paternity claim, arguing that mother alienated him from child, the child and K.P. had bonded during reintegration therapy, K.P. is the biological father, and K.P. cared for the child “as an involved Father from her birth through approximately her second year.” K.P. also argued that he has cleared his active warrants and had stable employment and housing. ¶ 10 A one-day paternity hearing was held in December 2022 with the parties submitting written closing arguments. The Department did not take a position on the paternity claims. The district court found that both K.P. and Z.L. had established paternity presumptions and that neither had rebutted the other man’s presumption. Then, applying the UPA factors, the court found the best interests of the child weighed in favor of adjudicating Z.L. the child’s legal father.
4 ¶ 11 K.P. appeals, contending that the district court erred in its paternity adjudication because (1) it failed to consider the significance of his name listed on the child’s birth certificate, and he 4 J.H. did not assert a paternity claim over the child although he maintained custody of the child’s three half-siblings. 
5 should have also had the paternity presumption in section 19-4-
105(1)(d), C.R.S. 2023; and (2) it abused its discretion by failing to adjudicate K.P. as the child’s legal father based on the weightier considerations of policy and logic. II. Standard of Review and Applicable Law ¶ 12 “The UPA governs the court’s jurisdiction to establish a parent-child relationship and mandates specific procedures that must be followed when a party seeks to establish paternity.” In re Support of E.K., 2013 COA 99, ¶ 9; see also §§ 19-4-101 to -130, C.R.S. 2023. As a result, the UPA can be invoked as part of a dependency and neglect proceeding. People in Interest of K.L.W., 2021 COA 56, ¶ 14; see also People in Interest of J.G.C., 2013 COA 171, ¶ 10. ¶ 13 A man is presumed to be a child’s natural father if, while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child. § 19-4-
6 105(1)(d); see People in Interest of O.S-H., 2021 COA 130, ¶ 52. A biological father is also a presumed parent. See § 19-4-105(1)(f).
5 ¶ 14 But neither presumption is conclusive, including the presumption in favor of a biological parent. N.A.H. v. S.L.S., 9 P.3d 354, 361 (Colo. 2000) (“[S]ection 19-4-105 does not indicate that the presumption of legitimacy automatically outweighs the presumption of biology, or that the converse is true.”). Rather, any presumption can be rebutted by clear and convincing evidence. § 19-4-105(2)(a); J.G.C., ¶ 21. ¶ 15 When two or more conflicting presumptions of paternity arise, and neither has been rebutted by clear and convincing evidence, the court must then determine by a preponderance of the evidence that the presumption founded on the weightier considerations of 5 Section 19-4-105(1)(f) states that a person is a presumed natural parent if [t]he genetic tests or other tests of inherited characteristics have been administered pursuant to section 13-25-126, and the results show that the alleged genetic parent is not excluded as the probable genetic parent and that the probability of the person’s genetic parentage is ninety-seven percent or higher. This subsection (3)(f) [sic] does not apply to a donor as defined in section 19-1-103. 
7 policy and logic controls. § 19-4-105(2)(a); J.G.C., ¶ 22. In determining which presumption controls, the court considers, in relevant part, (I) The length of time between the proceeding to determine parentage and the time that the presumed parent was placed on notice that the presumed parent might not be the genetic parent . . . ; (II) The length of time during which the presumed parent has assumed the role of the child’s parent; (III) The facts surrounding the presumed parent’s discovery of the possibility that the presumed parent was not a genetic parent . . . ; (IV) The nature of the existing parent-child relationship; (V) The child’s age; (VI) The child’s relationship to any presumed parent or parents; (VII) The extent to which the passage of time reduces the chances of establishing another person’s parentage and a child support obligation in favor of the child; and (VIII) Any other factors that may affect the equities arising from the disruption of the parent-child relationship between the child and the presumed parent or parents or the chance of other harm to the child. 
8 § 19-4-105(2)(a)(I)-(VIII). ¶ 16 This inquiry is fact intensive. N.A.H., 9 P.3d at 362. The court’s primary concern in “making a parentage determination is the child’s best interests and not the rights of, or the fairness to, each of the presumptive parents.” K.L.W., ¶ 50; see In re Parental Responsibilities Concerning A.R.L., 2013 COA 170, ¶ 18 (“[A]t the heart of any parentage decision is the child’s best interests.”). ¶ 17 We review de novo whether the court considered and applied the correct legal standard in determining paternity. K.L.W., ¶ 42. But we review the court’s paternity determination for clear error, People in Interest of M.B., 2020 COA 13, ¶ 39, which occurs if its factual findings are unsupported by the record, People in Interest of J.C.S., 169 P.3d 240, 243 (Colo. App. 2007) (“If the record supports a factual finding, we are bound by it under the clear error test.”). And we review for abuse of discretion the court’s fact-intensive process of weighing the statutory factors and the child’s best interest to determine which presumption should control. See W.C. in Interest of A.M.K., 907 P.2d 719, 722-23 (Colo. App. 1995); see also N.A.H., 9 P.3d at 362-66. An abuse of discretion occurs when 
9 the court’s decision is manifestly arbitrary, unreasonable, or unfair or a misapplication of the law. See W.C., 907 P.2d at 723. III. Preservation ¶ 18 Z.L. contends that K.P. did not preserve his arguments raised on appeal concerning the court’s consideration of certain presumptions to which K.P. now argues he was entitled. We agree. A. Name on Birth Certificate ¶ 19 K.P. contends that he preserved his argument that he was entitled to a conclusive legal determination of parentage because his name is on the child’s birth certificate and he is the biological father. He relies on the presumption in 19-4-105(1)(f), which governs the results of a genetic test that proved he was the biological parent. He points to the paternity results he filed in June 2022 that established him as the child’s biological father. ¶ 20 He also relies on section 19-4-105(1)(e), C.R.S. 2021, a provision that was in effect at the time Z.L. filed his motion seeking adjudication as the child’s legal father. But the General Assembly repealed that provision by the time the district court held the hearing and entered the paternity judgment. When in effect, section 19-4-105(1)(e) authorized a paternity presumption if a man 
10 acknowledged the paternity of a child in writing and the writing was filed with a court or the registrar of vital statistics. That provision stated, He acknowledges his paternity of the child in a writing filed with the court or registrar of vital statistics, which shall promptly inform the mother of the filing of the acknowledgment, and she does not dispute the acknowledgment within a reasonable time after being informed thereof, in a writing filed with the court or registrar of vital statistics, if such acknowledgment has not previously become a legal finding pursuant to paragraph (b) of subsection (2) of this section. If another man is presumed under this section to be the child’s father, acknowledgment may be effected only with the written consent of the presumed father or after the presumption has been rebutted.[
6
] § 19-4-105(1)(e), C.R.S. 2021. ¶ 21 K.P.’s argument continues that, although it is unclear whether mother asserted a paternity affidavit on his behalf, as required by section 19-4-105(2)(b), his name on the birth certificate and being 6 This provision was removed from the UPA by the General Assembly, effective August 10, 2022. See Ch. 210, sec. 4, § 19-4-
105(1)(e), 2022 Colo. Sess. Laws. 1390. Under the current version of the UPA, some but not all the elements of former section 19-4-
105(1)(e) appear in section 19-4-105(2)(a.5), although the requirements significantly differ. 
11 the biological father entitled him to two presumptions, the significance of which had not been considered by the court. ¶ 22 To support that he preserved these two presumptions, he points us to the December 6, 2022 hearing where he stated, “[The child] was already over 5 at that time [Z.L. filed his paternity determination motion] and it is my understanding that [K.P.’s] name did appear on the birth certificate of the child. In addition, there was a DNA – a paternity test done by DNA.” And, although he did not refer to his closing argument to support preservation, we note that he also made a similar statement there that he was entitled to two paternity presumptions. ¶ 23 We do not dispute that K.P. asserted these two presumptions below. But, as we mention above, section 19-4-105(1)(e) was not in effect by December 2022, and K.P. cannot rely on a presumption that was repealed by the General Assembly. ¶ 24 And even assuming K.P. could rely on that presumption because Z.L.’s paternity claim was filed before the provision was repealed, K.P.’s arguments were not preserved. At the December 6, 2022 hearing, K.P. failed to make the connection that subsections (1)(e) and (1)(f) entitled him to a conclusory parentage presumption 
12 over Z.L., or that because he had two presumptions, he was entitled to greater consideration under the UPA. He also did not make any argument that the voluntary acknowledgment of his parentage on the birth certificate entitled him to a de facto determination that he was the child’s legal parent. Simply referring to statutory provisions does not preserve an issue for appellate review if the litigant fails to adequately put the district court on notice as to how it should consider, interpret, or weigh those provisions. Therefore, we deem this argument unpreserved. See Wolven v. Velez, 2024 COA 8, ¶ 8 (“To preserve an issue for appeal, an appellant, during trial, must raise it in a manner specific enough that it ‘draws the [trial] court’s attention to the asserted error.’” (quoting People v. McFee, 2016 COA 97, ¶ 31)); Curry v. Zag Built LLC, 2018 COA 66, ¶ 61 (“To preserve a contention, a party does not have to cite a specific statute, but it must at least raise the issue to the trial court, so that the court has an opportunity to rule on it.”) (citations omitted). ¶ 25 And any claim on appeal that he was entitled to a conclusive determination of paternity is contrary to the position he took in his closing argument, where he said that the case was one of competing 
13 presumptions because no one presumption had been rebutted by clear and convincing evidence, and therefore, the court needed to decide the UPA claim on the “weightier considerations of policy and logic.” Therefore, we will not address this argument on the merits. See Laleh v. Johnson, 2016 COA 4, ¶ 8, aff’d on other grounds 2017 CO 93. B. Section 19-4-105(1)(d) ¶ 26 K.P. also contends that “the district court failed to consider that he was entitled to a presumption of paternity pursuant to [section 19-4-105(1)(d)] in that for the first two years of [the child’s] life she lived with K.P. and Mother as a family and K.P. openly held her out as his natural child.” While that may be true, K.P. specifically argued to the district court that he was entitled to the presumptions in subsections (1)(f) and (1)(e) of section 19-4-105, and that Z.L. was entitled to the presumption in subsection (1)(d). So, not only is K.P.’s appellate argument unpreserved, but his position below invited the court’s alleged error in failing to afford him the presumption of section 19-4-105(1)(d). Thus, we will not review his new claim. See People v. Zapata, 779 P.2d 1307, 1309 (Colo. 1989) (“[A] party may not complain on appeal of an error that 
14 he has invited or injected into the case; he must abide by the consequences of his acts.”).
7 IV. The Paternity Adjudication ¶ 27 K.P. contends the district court erred by determining that the weightier considerations of policy and logic favored adjudicating Z.L. as the child’s legal father. We disagree. A. District Court Order ¶ 28 Although the district court did not explicitly identify which presumption belonged to Z.L. and which belonged to K.P., it determined that the men had competing presumptions. As noted above, K.P. asserted the paternity presumption in section 19-4-
105(1)(f) that he was the child’s biological parent and the presumption in section 19-4-105(1)(e) that his name appeared on the child’s birth certificate. Z.L. asserted the presumption in section 19-4-105(1)(d) that he had taken the child into his home and had held the child out as his own. Although the court did not explicitly find whether any presumptions had been rebutted by 7 And, though we need not decide it, we question whether the biological father can even assert a paternity presumption under section 19-4-105(1)(d). 
15 clear and convincing evidence, it implicitly concluded that none had been rebutted when it turned to the second part of the analysis in the UPA. ¶ 29 For the reasons we stated above, K.P. had not preserved his arguments that he had essentially rebutted Z.L.’s presumption by being both the child’s biological parent and having his name on the child’s birth certificate. And, as also noted above, K.P. took the position in his closing argument, quoting section 19-4-105(2)(a), that “no presumptions were rebutted, and the court must determine the competing presumptions based on the ‘weightier considerations of policy and logic.’” ¶ 30 The district court then resolved the competing presumptions considering the factors in section 19-4-105(2)(a)(I)-(VIII) and what would be in the child’s best interests, finding Z.L. to be the child’s legal father. We conclude that the district court applied the correct legal standard in determining paternity. B. Weightier Considerations of Policy and Logic and Best Interests Analysis ¶ 31 Turning to the merits determination, we conclude that the district court did not abuse its discretion in weighing the factors 
16 found in section 19-4-105(2)(a)(I)-(VIII), as there is evidence supporting the court’s decision in the record. We also conclude that the court did not abuse its discretion by determining that it was in the best interests of the child for Z.L. to be adjudicated the child’s legal father. Therefore, we discern no basis to disturb the district court’s order. ¶ 32 Considering the length of time K.P. and Z.L. had assumed a parental role under section 19-4-105(2)(a)(II), the district court recognized that K.P. and mother “were an intact couple when child was born and for the first [eighteen] months of her life,” and that following K.P.’s disengagement, Z.L. had an immediate relationship with the child “without a break from July of 2017 to now.” Indeed, K.P. did not interact with the child from 2017 until after the commencement of the dependency and neglect action giving rise to the subject paternity determination, and the court surmised that K.P. would not have reentered the child’s life but for the court action. K.P. admitted that he had been absent from the child’s life for “three to four years.” ¶ 33 The district court considered the nature of the existing relationships between child and both Z.L. and K.P. under section 
17 19-4-105(2)(a)(IV) and (VI). It determined that K.P. admitted he had not prioritized the child for many years because he had been busy with familial health issues and his criminal matters. K.P. stated, “[B]efore I can get my daughter, I have to save my life,” when referring to his criminal matters. ¶ 34 K.P. further claimed that he had been unable to maintain his relationship with the child because of mother’s alienation. The court found that, although there “has been alienation,” K.P.’s disengagement was more a result of his failure to act than mother’s behavior. For example, the court noted that “there was a domestic violence incident [between K.P. and mother] and a protection order was granted” for mother’s safety. ¶ 35 And mother asserted that she did not alienate K.P. from the child, but that K.P. neglected his parental responsibilities once her relationship with Z.L. was made “Facebook official” in 2017. The record supports that, even though there was a protection order in place, K.P. had been allowed to communicate with mother and the child through the “Talking Parents app,” but he never did. ¶ 36 The district court considered the child’s age under section 19-
4-105(2)(a)(V). It concluded that K.P. was present in the child’s life 
18 through the first few years, but that Z.L. “has been present for a much longer duration of the child’s life.” Indeed, since June 2017, Z.L. had held himself out as the child’s father and became a de facto parent in K.P.’s absence. ¶ 37 And the record supports that even after Z.L. and mother had separated, Z.L. continued to have contact with the child, including midweek dinners and extended stays with the child every Sunday. Z.L. testified that he supports the child “financially, emotionally, pretty much psychologically. If she needs something, even if she wants something, I feel not obligated but I’m driven to try to get it for her.” Mother agreed with Z.L. that he is the child’s psychological father. ¶ 38 The court noted that J.H. had the strongest case for paternity, ostensibly because J.H. was the father of the child’s three half-
siblings. But as mentioned above, J.H. did not assert a paternity claim. The court found instead that between Z.L. and K.P., the child’s relationship was stronger with Z.L. The record indicates that the child had been apprehensive to engage in reintegration therapy with K.P. because “she only heard bad things about him” and her maternal family has ill feelings toward him. The child, however, 
19 later reported a positive relationship with K.P. after both engaged in reintegration therapy. ¶ 39 Even so, the child referred to Z.L. as “Dad,” Z.L. held the child out as his own, and Z.L. had acted as a parent by supporting but also disciplining the child. The court found “there is a clear bond and attachment” between the child and Z.L. When asked how he knew the child loved him, Z.L. stated, “Aside from us telling each other, ‘I love you,’ I just – I see it when I go to pick her up for visits and stuff.” He pointed to specific instances, saying, “I ring the doorbell and she suddenly appears behind me because she came out of the garage and she’s all smiles and jumping up and down, ‘Where are we going? What are we doing?’ It’s cool to feel wanted like that so I think it’s based in love.” ¶ 40 And despite the fact that Z.L. and mother were no longer a couple, the court found that Z.L. continued to provide financial support to mother and the child and Z.L. saw the child at least two times a week. Indeed, when probed about his understanding that he would potentially be required to pay child support if adjudicated the legal father, Z.L. stated, “[T]hat doesn’t matter,” and “[t]hat’s my daughter. I support her now anyways. I will continue to support 
20 her. Even if I’m not required to pay child support or however this goes, if [the child] ever needed anything from me, she could call on me, so.” Although K.P. had asserted he had obtained a successful job, there was no evidence that he had financially supported the child for the previous four years. Specifically, mother testified that K.P. provided financial support for the child when the two were a couple, but once she began to date Z.L., K.P. stopped helping financially and mother did not bother seeking child support. ¶ 41 Weighing all the factors together, the court considered the child’s best interest and determined that, although it is important for the child to have a relationship with her biological father, the child’s relationship was stronger with Z.L. And the court credited the court evaluator’s testimony that “[found] it highly detrimental to sever the only parent child relationship she has.” ¶ 42 Nonetheless, K.P. rehashes the arguments that the court erred in its analysis because he is the biological father and his name appears on the birth certificate. But biology is not a dispositive factor under the UPA, and it is measured against the other presumptions listed in section 19-4-105(1) if another man has asserted and has proved that he is also entitled to a paternity 
21 presumption. See N.A.H., 9 P.3d at 361. By listing a myriad of potential paternity presumptions, the General Assembly has evinced its intent that no factor is dispositive but must be decided under the UPA framework and guidelines, which is precisely what the court did here. See People v. Coleman, 2018 COA 67, ¶ 41. ¶ 43 And many of K.P.’s arguments relate to the court’s application of the statutory factors, which would require us to reweigh the evidence, something we cannot do. See Owners Ins. Co. v. Dakota Station II Condo. Ass’n, 2021 COA 114, ¶ 50 (it is within the sole province of the fact finder to determine the sufficiency and weight of the evidence, and we may not reweigh evidence or substitute our own judgment for that of the fact finder). Nor is it proper for us to make credibility determinations as to witness testimony. See Chapman v. Willey, 134 P.3d 568, 569 (Colo. App. 2006) (noting that a court’s credibility determination will only be disturbed if clearly erroneous and not supported by the record). ¶ 44 For example, although the court found that both mother and K.P. were not credible on their contrary allegations as to why they separated, the court gave the edge to mother because a protection order had been issued against K.P. given his domestically violent 
22 actions toward mother. Based on K.P.’s many years’ absence from the child’s life and his lack of financial support for the child, and Z.L.’s continued presence and financial support, even though he and mother are now separated, the court did not abuse its discretion by concluding that it would be “detrimental” to sever the relationship the child has with Z.L., and thus, it was in the child’s best interest for Z.L. to be adjudicated the child’s legal father. ¶ 45 On this record, we discern no basis for reversal of the court’s judgment. V. Conclusion ¶ 46 The judgment is affirmed. JUDGE NAVARRO and JUDGE PAWAR concur.