23CA1037 & 23CA1038 Brown v Smith 11-27-2024

COLORADO COURT OF APPEALS

---

Court of Appeals Nos. 23CA1037 & 23CA1038
City and County of Denver District Court No. 21CV30831
Honorable Alex C. Myers, Judge
Honorable Sarah B. Wallace, Judge

---

Brown & Caldwell, a California corporation,

Defendant-Appellee and Cross-Appellant,

v.

Smith Environmental & Engineering, Inc., a Colorado corporation,

Third-Party Defendant-Appellant and Cross-Appellee.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Schock and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 27, 2024

---

Snell & Wilmer L.L.P., Michael E. Lindsay, James Kilroy, Ellie Lockwood, Denver, Colorado, for Defendant-Appellee and Cross-Appellant

Lewis Roca Rothgerber Christie LLP, Kendra N. Beckwith, Joseph Hykan, Denver, Colorado; Overturf McGath & Hull, P.C., David M. Bost, Lindsey W. Jay, Denver, Colorado, for Third-Party Defendant-Appellant and Cross-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Third-party defendant, Smith Environmental & Engineering, Inc. (Smith), appeals several pretrial rulings, the district court's judgment, and the jury's verdict finding Smith liable to Brown & Caldwell (B.C.) for damages incurred by the City and County of Denver, acting by and through its Board of Water Commissioners (Denver Water), after work performed by B.C. (Denver Water's contractor) and Smith (B.C.'s subcontractor) resulted in an asbestos-containing-materials (ACM) spill during a reservoir demolition project. B.C. cross-appeals one issue. We affirm and remand the case with directions, so the district court may determine the reasonable amount of B.C.'s appellate attorney fees.

## I.     Background

¶ 2     This appeal arises from a breach of contract dispute between Denver Water, B.C., and Smith after an asbestos spill occurred during demolition work at Denver Water's Hillcrest water storage facility in Denver, Colorado (Hillcrest).

¶ 3     When Denver Water sought to replace the existing facilities at Hillcrest — constructed in the 1960s — it approached B.C. to handle part of the project. B.C.'s obligations were memorialized in a contract executed in August 2014 (the Prime Agreement).

¶ 4    Denver Water knew that the Hillcrest facilities contained ACM that would need to be specially handled in the demolition.  B.C. thus subcontracted with Smith to prepare a report identifying where asbestos and other hazardous materials were located within the building (the Subcontract), so they could be properly handled during demolition.

¶ 5    Brian Keyes authored the hazardous materials report for Smith (the Smith Report or the Report).  The Smith Report identified several areas within Hillcrest that might contain ACM. The Report included a review of Hillcrest's original construction plans to determine where asbestos might have originally been placed.  The Report included a diagram that used red boxes to highlight "areas with suspect ACM" (the ACM diagram).  A reproduction of the ACM Diagram is depicted below with enlarged references to the ordinal orientation of each wall.



The ACM Diagram

¶ 6     The ACM Diagram shows that ACM is suspected to be present around the "box conduit" pipes running the entire length of the reservoir's northeast (NE) and southeast (SE) walls (toward the top and right sides) in the form of "transite" panels containing cement and asbestos.  On the right side of the ACM Diagram, in a cross section labeled "Section B," there is a red box around the northwest (NW) wall to the box conduit.  This cross section is depicted with two arrows labeled Section B.  On the left of the ACM Diagram, at the NW wall, there is an arrow pointing up toward the NE wall.  On

3

this side of the ACM Diagram, there is no red box around the NW wall or the Section B arrow. The other arrow appears on the SE wall, similarly pointing up toward the NE wall. There is a red box around the SE wall and the Section B label.

¶ 7 The Smith Report failed to identify a continuous strip of transite panels that ran around the edge of the entire reservoir, including along the southwest (SW) wall. Keyes stated in a deposition that he "missed" the diagram's reference to a continuous strip of transite panels along the SW wall and did not mark it with a red box in the Smith Report.

¶ 8 In April 2019, during demolition, Denver Water learned that about 200 feet of transite panels were disturbed, and asbestos was found in the soil and on the equipment used to "crush" concrete for reuse. The resulting spill forced Denver Water to halt the project and engage in asbestos remediation, causing delays and additional costs for Denver Water's demolition contractor.

¶ 9 In March 2021, Denver Water sued B.C. for breach of the Prime Agreement, seeking the costs it incurred to mitigate the spill. Soon after, B.C. filed third-party claims against Smith, alleging that Smith (1) had breached the Subcontract, (2) had contractual and

4

common law indemnification duties, and (3) was required to defend B.C.

¶ 10     The Prime Agreement made B.C. "responsible for the professional quality, technical accuracy, timely completion, and coordination of all studies, reports and other Work" covered by the Prime Agreement, and B.C. agreed to conduct all work "with the usual thoroughness and competence and in accordance with generally accepted standards of care of [B.C.'s] profession prevailing in Colorado and utilized by competent engineering firms."

¶ 11     B.C. also "agree[d] to indemnify, defend, and hold [Denver Water] harmless from and against any liability to the extent arising out of the negligent errors or negligent omissions of [B.C.], its agents, employees, or representatives, in the performance of [B.C.'s] duties."

¶ 12     The Subcontract, in turn, obligated Smith to "perform its services with the standard of care, diligence and skill ordinarily exercised by firms providing similar services and in accordance with accepted and sound professional practices and procedures."

¶ 13     The Subcontract also obligated Smith to

indemnify, defend and hold harmless Client, [B.C.], their officers, directors, agents, and employees ("Indemnitees") from and against all claims, damages, losses and expenses (including attorneys' fees and other legal expenses) arising out of, or in connection with any negligent act or omission, willful misconduct or breach of contract by Subcontractor, its employees, or others for whom Subcontractor may be legally liable.

¶ 14     Finally, the Subcontract added that

[t]hose obligations [B.C.] has assumed to [Denver Water] under the Prime Agreement, which are applicable to [Smith's] Scope of Services herein, shall in turn be assumed by [Smith] to [B.C.]

## II.     Procedural History

¶ 15     The most pertinent events in the case's procedural history are included in the timeline below.



Procedural History Timeline

¶ 16    In December 2021, B.C. moved for a determination of law under C.R.C.P. 56(h) against Smith, requesting the court determine, as a matter of law, that the Subcontract included a duty to defend and that Smith assumed and breached its duty to defend B.C. against Denver Water.  Smith contended that the Subcontract did not impose a duty to defend (nor a duty to indemnify) B.C. unless and until the court made a finding of Smith's fault, asserting that, outside the insurance context, the scope of the duty to defend is narrow.

¶ 17    Later, in February 2022, Denver Water moved for partial summary judgment against B.C.  Denver Water argued that there was no genuine dispute of material fact that (1) B.C. had entered into the Prime Agreement with Denver Water; (2) Denver Water had performed its duties under the Prime Agreement; and (3) B.C. had breached the Prime Agreement because Smith's Report was technically inaccurate and "did not comply with accepted industry standards for asbestos inspections"; thus, B.C. was liable.  Denver Water attached the report of its expert, Robert Szynskie, with his sworn affidavit, to support its motion.

¶ 18    B.C. soon filed a competing cross-motion for summary judgment, arguing that Denver Water "failed to disclose an expert to establish that B.C. breached the applicable standard of care" and that Denver Water was not entitled to indemnification for damages it suffered directly.  Smith's counsel entered an appearance on May 6, 2021, but Smith took no position on the competing summary judgment motions.

A.    The Duty to Defend Order

¶ 19    In June 2022, the district court ruled on B.C.'s Rule 56(h) motion (the Duty to Defend Order).  The court found that, even

8

outside the insurance context, Smith's duty to defend B.C. was triggered by Denver Water's allegations implicating the Report and Smith's work. The court, relying on *Lafarge North America, Inc. v. K.E.C.I. Colorado, Inc.*, 250 P.3d 682, 688 (Colo. App. 2010), noted that Smith undertook a duty to defend B.C. for Smith's acts arising out of, as relevant here, breach of the Subcontract.

¶ 20　Furthermore, the court found that the Subcontract unambiguously imposed separate duties for Smith to defend and to indemnify B.C. Rejecting Smith's invitation to merge the two duties, the district court declared that, as a matter of law, Smith had a duty to defend B.C. against Denver Water's claims, and Smith had breached that duty.

### B.　The Partial Summary Judgment Order

¶ 21　In December 2022, the district court ruled on Denver Water and B.C.'s competing motions for partial summary judgment (the PSJ Order). In ruling on Denver Water's motion, the court found that Denver Water established that (1) a contract — the Prime Agreement — existed between B.C. and Denver Water; (2) Denver Water had substantially performed its duties under the Prime

Agreement; and (3) the Smith Report resulted in a breach of two duties B.C. owed to Denver Water under the Prime Agreement.

¶ 22   As to the breach of B.C.'s first duty — that it was "responsible for the professional quality, technical accuracy, timely completion, and coordination of all studies, reports and other Work" — the district court found the Smith Report was "not technically accurate in that it failed to identify transite and assumed ACM from the original construction drawings." The court noted it was undisputed that the Report missed some ACM areas despite them being "plainly marked" in the original construction plans. Because B.C. was responsible for the technical accuracy of its own and its subcontractors' reports and work, it had breached that duty.

¶ 23   For the second duty, the court found that B.C. also breached its duty to conduct all work "with the usual thoroughness and competence and in accordance with generally accepted standards of care of [B.C.'s] profession prevailing in Colorado and utilized by competent engineering firms." While B.C. and Denver Water disagreed about the applicable standard of care, Denver Water supported its motion with unrebutted sworn expert testimony concluding that the Report was inaccurate and that "neither Smith

nor [B.C.] complied with the generally acceptable standards of care."

¶ 24 The court added that B.C. filed no sworn testimony to rebut these conclusions, and it rejected B.C.'s argument that Szynskie could not testify to the applicable standard of care because he was not a licensed engineer. The court noted that "[B.C.] represent[ed] that all work w[ould] be performed in accordance with any generally accepted standards of care (plural) of its profession . . . and utilized by competent engineering firms . . . consistent with the scope of the Agreement which include[d] engineering and non-engineering services."

¶ 25 Because the Prime Agreement covered both engineering and non-engineering services (like asbestos inspections), the court noted that construing the Prime Agreement to subject B.C. to only the standard of care for professional engineers would be "unworkable." Thus, the district court accepted Szynskie's testimony and, without any contrary evidence, found B.C. had failed to meet the applicable standard of care constituting a breach of the Prime Agreement.

¶ 26 The district court therefore granted Denver Water's motion for a determination of law that B.C. was liable to Denver Water for its

breach of the Prime Agreement — leaving only the question of whether Denver Water suffered damages because of B.C.'s breach for trial. The district court also rejected B.C.'s cross-motion for summary judgment on Denver Water's indemnification claim based on competing evidence concerning the sources of Denver Water's damages, though the court agreed that Denver Water was limited to indemnification damages for costs incurred by third parties only, not other damages it directly incurred.

## C. The Indemnification Order

¶ 27 In January 2023, Smith moved for leave to file a motion for summary judgment against B.C., arguing that B.C. had failed to disclose expert testimony that Smith violated the applicable standard of care.

¶ 28 B.C. responded that Smith had failed to meet its contractual duty to defend B.C. and that expert testimony on Smith's standard of care had no bearing on its claims against Smith. B.C., however, did not oppose Smith's request to file the motion if (1) it was able to respond to it and file a competing summary judgment motion, and (2) the district court resolved the issue before trial.

¶ 29    The district court, with Judge Sarah B. Wallace now presiding,[1] denied Smith's motion but ordered expedited briefing on two legal questions that it determined needed to be decided ahead of trial:

> (1) Whether Judge [Myers] explicitly or implicitly has already ruled that Defendant Smith is in breach of its indemnification obligation based on his recent summary judgment ruling or prior rulings. If not, is that the necessary corollary of his rulings?
>
> (2) If this issue has not already been decided and [B.C.] must prove Smith's breach, does [B.C.] need an expert to prove Smith's breach and if so, must I grant judgment in Smith's favor?

¶ 30    In its briefing, Smith argued that the Duty to Defend Order did not explicitly rule that Smith had breached its indemnification duty, a duty distinct from the duty to defend. And Smith argued that the PSJ Order never implicitly or explicitly found that Smith breached its indemnification duty — despite finding that the Smith Report

---

[1] Between the issuance of the PSJ Order and the Indemnification Order, a division rotation in the district court replaced Judge Alex C. Myers with Judge Sarah B. Wallace, who presided over the case through the end of trial.

was technically inaccurate. According to Smith, expert testimony was required to show that it breached the Subcontract.

¶ 31 B.C., in turn, argued that the necessary corollary of both orders was that Smith breached its indemnification duty. B.C. argued that the court's finding that B.C. breached the Prime Agreement was based on the deficient Report, and since the Subcontract incorporated B.C.'s obligations in the Prime Agreement for Smith's services, Smith's duty to indemnify B.C. was necessarily triggered.

¶ 32 B.C. also noted that Smith was a party to the lawsuit and had every opportunity, indeed a contractual obligation, to defend its position — yet it never responded to Denver Water's motion, and it should be precluded from relitigating this issue. And, regardless, expert testimony was not required to prove Smith breached the standard of care.

¶ 33 On February 3, 2023, the district court orally ruled that the PSJ Order's conclusion that B.C. breached the Prime Agreement "hinged exclusively on Smith's [c]onduct" and the Report's accuracy (the Indemnification Order). The court also found that (1) Smith "assumed [B.C.]'s obligations" under the Prime Agreement; (2) the

PSJ Order "found that [B.C.] breached its contractual obligations as they relate to Smith's work"; and (3) "Smith agreed to indemnify for damages arising from its breach of contract."

¶ 34   The court acknowledged that Smith wanted to present evidence "that it was not negligent and that the Smith report was technically accurate [but that] the time to do that was when [B.C.] was defending [Denver Water's] summary judgment motion." The court added that "[i]t was very obvious that Denver [Water] was asking for summary judgment on issues that would directly impact Smith's liability, but Smith did not ask to participate in the briefing. Instead, it sat on the sidelines."

¶ 35   Because the Subcontract subsumed B.C.'s contractual obligations to Denver Water and bound Smith to those same obligations — including to provide an accurate report — and because the PSJ Order found that B.C. had breached the Prime Agreement based on the Smith Report's inaccuracies, "it necessarily follows that Smith breached the contract with [B.C.]" Smith's indemnification duty was therefore triggered.

¶ 36   The court ruled that "the necessary corollary to Judge Myers' prior rulings is that Smith is liable to [B.C.] under its claim for

15

breach of contract and breach of indemnification with the amount of damages to be determined at trial."

¶ 37 Smith filed a motion to reconsider the ruling, arguing that the court improperly conflated B.C.'s contractual obligations to Denver Water with Smith's obligations to B.C. and that Smith could now be held liable for B.C.'s breaches of contract unrelated to Smith's conduct. Smith also argued that it would be prejudiced if denied the opportunity to present a defense at trial.

¶ 38 The district court orally denied the motion for reconsideration, clarifying that "the inevitable conclusion" of the Duty to Defend and PSJ Orders was that Smith was liable but only for the work it undertook. The court added, "I want to make it very clear that I have absolutely not precluded evidence . . . [that B.C.] had additional breaches beyond the Smith [R]eport," and reiterated that its ruling was limited to B.C.'s and Smith's breach as it related to the Report.

D. The Verdict and Post-Trial Motions

¶ 39 A jury heard Denver Water's claims over five days of trial, beginning on February 6, 2023. Before trial, Denver Water took the position that it would be pursuing additional breach of contract

16

claims against B.C. beyond the breach related to the Report. When B.C. and Denver Water finalized the jury instructions, Denver Water first notified the court that it would not pursue breach of contract claims other than those related to the Smith Report, noting in the "simplified" joint proposed jury instructions that "Denver Water no longer intends to seek[] a factual finding of liability from the jury on the alleged additional breaches of the contract."

¶ 40    The jury awarded Denver Water $1,257,926.67 for its claims against B.C. and awarded B.C. $999,352.86 for its third-party claims against Smith. After trial, B.C. and Smith filed separate motions for judgment notwithstanding the verdict (JNOV).

### 1.    B.C.'s JNOV Motion

¶ 41    In B.C.'s JNOV motion, it argued that the jury was erroneously allowed to award damages on different, additional breaches when Denver Water chose not to pursue any other claims for breach of contract beyond the Smith Report breach. B.C. argued that because Smith was required to indemnify B.C. for all damages awarded to Denver Water, B.C.'s damages award against Smith should have been amended to match Denver Water's award.

17

¶ 42    Denver Water argued that the differing damages awards resulted from B.C.'s failure to prove that all of the damages the jury awarded to Denver Water were caused by Smith's breach.  Smith made the same argument, adding that some of Denver Water's damages were caused by B.C.'s use of the Report.

¶ 43    The district court denied B.C.'s motion.  It noted that despite Denver Water's supposed withdrawal of claims unrelated to the Smith Report, the jury instructions (which B.C. consented to) supported Denver Water's pursuit of additional breach of contract claims, noting that several instructions would have been unnecessary if the only breach related to the Report.  Thus, the court declined to modify the damages award.[2]

### 2.    Smith's JNOV Motion

¶ 44    Smith also filed a JNOV motion requesting a new trial or a reversal of the verdict.  Smith argued that the Indemnification Order should be vacated because a conflict between B.C. and Smith prevented Smith from defending B.C. without undermining Smith's own claims.  Smith also argued it was denied the right to litigate

---

[2] The district court agreed, however, that B.C. was entitled to prejudgment interest against Smith.

B.C.'s liability after B.C. failed to contest the PSJ Order with "due diligence and reasonable prudence" by failing to rebut Denver Water's expert. Thus, Smith argued it was not bound by the PSJ Order.

¶ 45 Alternatively, Smith argued that the Indemnification Order should be vacated because the PSJ Order was granted in error, contending that Szynskie could not have testified about the applicable standard of care because he was not a licensed engineer, and the court improperly assessed Szynskie's credibility. Smith also argued that the Indemnification Order was granted without giving it an opportunity to dispute facts. Further, Smith argued that B.C. and Smith's standards of care differed.

¶ 46 Finally, Smith argued that the court's decision to exclude evidence that the spill occurred in an area marked by red boxes in the Report was erroneous and that it should have been allowed to dispute causation, so a new trial was warranted.

¶ 47 B.C. responded that Smith owed B.C. a duty to defend and acted unreasonably; breached its duty to defend months before the PSJ Order and did not contest the Duty to Defend Order; and had every opportunity to litigate its liability but failed to do so. B.C. also

argued that the PSJ Order was proper, that the court properly excluded Smith's evidence about the spill's location, and that any error was harmless because Smith had amply questioned witnesses on this topic.

¶ 48    The district court denied Smith's motion, because Smith never raised its conflict-of-interest argument ahead of trial and thus waived it.  Moreover, Smith was a party to the litigation from the start and could have protected its interests.

¶ 49    Because Smith failed to challenge the PSJ Order, the court found Smith waived any argument that it was improper.  The PSJ Order was based on the undisputed fact that the Report was inaccurate.  The court did not based its inaccuracy findings on credibility determinations; it rejected B.C.'s arguments concerning Szynzkie's qualifications and granted summary judgment largely because Szynzkie's testimony was unrebutted.

¶ 50    Next, the district court found that Smith had ample opportunity to contest its liability.  Smith knew that the Report, and its accuracy, were the crux of the PSJ Order, as the court noted, "The fact that for trial strategy, [Smith] decided to not defend the Smith Report does not equate to not having an opportunity to be

heard. . . . [T]he time to defend the Smith Report was prior to the Court's finding, as a matter of law, it was technically deficient." It also noted that no party asked to continue trial, so its expedited briefing order was necessary.

¶ 51 The district court then found that the Indemnification Order had not conflated the applicable standards of care. Rather, it found that, because B.C. breached the Prime Agreement when it submitted the inaccurate Report, Smith had therefore breached the Subcontract, requiring Smith to indemnify B.C.

¶ 52 Finally, the district court rejected any suggestion that it improperly limited Smith's challenge to whether the spill occurred in a red-boxed area. It understood Smith "was seeking an admission from the Denver Water employee that the . . . Report was not technically inaccurate because Denver Water should have known that transite existed on the [NW] wall despite there not being a red box calling it out."

¶ 53 The PSJ Order, however, was based on the fact that the Report was inaccurate, so the excluded testimony would therefore have contradicted the PSJ Order. And Smith "presented considerable evidence throughout the trial . . . that the asbestos spill fell within

one of the red boxes that [Smith] identified. The jury rejected that defense." As a result, the court found that the excluded testimony would have been cumulative.

### III. Issues on Appeal

¶ 54 Smith's appeal raises several issues, namely that (1) the Duty to Defend Order violated the Subcontract's plain language; (2) the Indemnification Order was improper; (3) the district court erroneously excluded the red-box-causation evidence; and (4) the district court wrongly amended the duty to defend judgment to add a "new category of damages."

¶ 55 On cross-appeal, B.C. argues that the district court erred by allowing the jury to decide B.C.'s indemnification claim and allowing the jury to award B.C. and Denver Water different amounts of damages. B.C. also requests appellate attorney fees. Denver Water initially joined this appeal but was dismissed on October 25, 2024, pursuant to the parties' stipulation.

### IV. Standard of Review

¶ 56 "We review a trial court's summary judgment order de novo." *Edwards v. New Century Hospice, Inc.*, 2023 CO 49, ¶ 14. "Summary judgment is appropriate when the pleadings and

22

supporting documents establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Gibbons v. Ludlow*, 2013 CO 49, ¶ 11.

¶ 57 "The construction of a contract is a question of law" that we review de novo. *Boulder Plaza Residential, LLC v. Summit Flooring, LLC*, 198 P.3d 1217, 1220 (Colo. App. 2008); *see also Mid Century Ins. Co. v. Gates Rubber Co.*, 43 P.3d 737, 739 (Colo. App. 2002). We must strive to effectuate the contracting parties' intent, as determined primarily from the contract's language. *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005); *Boulder Plaza*, 198 P.3d at 1220-21.

¶ 58 To do this, we look to the language of the provision at issue, giving the words and phrases used their plain and ordinary meanings, and to any other related provisions so as to interpret the contract in a way that harmonizes and gives effect to all its provisions. *E. Ridge*, 109 P.3d at 974; *Boulder Plaza*, 198 P.3d at 1221; *Mid Century*, 43 P.3d at 739.

¶ 59 If, after applying these principles, we conclude that the provision is unambiguous, we must apply it as written. *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 136 (Colo. 1998); *Mapes v. City*

23

*Council*, 151 P.3d 574, 577 (Colo. App. 2006). A contract provision is ambiguous "if it is fairly susceptible to more than one interpretation." *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996) (citation omitted); *accord E. Ridge*, 109 P.3d at 974. However, the mere fact that the parties express different opinions as to the meaning of the provision does not itself establish ambiguity. *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 146 (Colo. 2006); *E. Ridge*, 109 P.3d at 974.

¶ 60     We may affirm the district court on any ground supported by the record. *City of Aurora v. Dep't of Revenue*, 2023 COA 17, ¶ 11.

## V.     Analysis

### A.     The Duty to Defend Order was Proper

¶ 61     Smith first argues that the Duty to Defend Order violated the plain language of the Subcontract. According to Smith, until there was a finding of liability, it had no duty to defend B.C. B.C. counters that Smith's obligation to provide a defense was triggered by the allegations in Denver Water's complaint.

#### 1.     The Subcontract's Indemnity Clause

¶ 62     Recall that the indemnity clause, section VIII of the Subcontract, provides that Smith "shall indemnify, defend and hold

harmless Client, [B.C.], their officers, directors, agents and employees ("Indemnitees") from and against all claims, damages, losses and expenses (including attorneys' fees and other legal expenses) arising out of, or in connection with any . . . breach of contract by Subcontractor."[3] We construe the indemnity clause using the same principles that govern the interpretation of contracts generally, reviewing them de novo. *See E. Ridge,* 109 P.3d at 974; *Boulder Plaza,* 198 P.3d at 1221; *Mid Century,* 43 P.3d at 739.

2.     Analysis of the Indemnity Clause

¶ 63     We conclude that the indemnity clause unambiguously requires Smith to defend B.C. "from and against all claims . . . arising out of, or in connection with" Smith's breach of the Subcontract. A "claim" is the "assertion of a right." Black's Law Dictionary 311-12 (12th ed. 2024). Nothing in the definition suggests that the claim must first be judicially recognized. *Id.* (A claim is "any right to payment . . . even if contingent or

---

[3] B.C.'s contract with Denver Water also had indemnity provisions, but the parties agree that the subcontract's provision is the operative one here.

25

provisional."); *see also Trosper v. Wilkerson*, 764 P.2d 375, 377 (Colo. App. 1988) (concluding that a tax audit was part of a "claim, demand, or action" leading to a potential duty to indemnify). So the district court did not need to adjudicate Smith's liability before concluding that Smith's duty to defend was triggered. Rather, the duty was triggered when B.C. demanded a defense after Denver Water filed its complaint advancing "claims" related to B.C.'s and Smith's alleged contractual breaches.

¶ 64　　Smith could have requested a judicial declaration concerning its duty to defend B.C., *see EMC Ins. Cos. v. Mid-Continent Cas. Co.*, 884 F. Supp. 2d 1147, 1156 (D. Colo. 2012) (declaratory relief may define the contractual obligations), or it could have agreed to defend B.C. under a reservation of rights, *see, e.g.*, *Shelter Mut. Ins. Co. v. Vaughn*, 2013 COA 25, ¶ 7. It did neither. Rather, B.C. made the first request for a determination concerning Smith's duty to defend on December 13, 2021, when it filed its Rule 56(h) motion. In the Duty to Defend Order the district court ruled that Smith had a duty to defend B.C. and that Smith breached that duty. Even with this ruling, however, Smith did not assume B.C.'s defense.

¶ 65    Relying on *Lafarge*, 250 P.3d at 688, the district court concluded that Smith's duty to defend was triggered by the allegations in Denver Water's complaint because those allegations *could* trigger (if proven) Smith's obligation to indemnify B.C.

¶ 66    As noted, Denver Water's Amended Complaint alleged that Smith's work was deficient because Smith failed to identify ACM at the project site.  Because the Smith Report failed to alert Denver Water's contractors to areas with ACM, their demolition activities disturbed ACM; caused an asbestos spill that had to be remediated; and created unexpected (and costly) delays, resulting in damages. The district court concluded these allegations were sufficient to trigger Smith's duty to defend B.C., and because Smith had not provided B.C. a defense, the court also concluded that Smith breached it.

¶ 67    On appeal, Smith continues to argue that without establishing Smith's liability, its duty to defend B.C. was not triggered.  But the duty to defend is distinct from the duties laid out in the indemnity clause.  True, the duty to indemnify is typically not triggered until liability is imposed.  *See Cyprus Amax Mins. Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) (examining duties to defend and

27

indemnify in an insurance context); *see also Serna v. Kingston Enters.,* 72 P.3d 376, 380 (Colo. App. 2002) (common law duty to indemnify does not arise until the liability of the party seeking indemnity results in damage). But the duty to defend may (and often does) arise well before the duty to indemnify takes root. *Cyprus Amax,* 74 P.3d at 299 (recognizing that the duty to defend is broader than the duty to indemnify); *Const. Assocs. v. N.H. Ins. Co.,* 930 P.2d 556, 563 (Colo. 1996) (noting that "duty to defend arises where the alleged facts even *potentially*" are covered).

¶ 68    The challenged indemnity provision is similar in principle to the one examined in *Public Service Co. of Colorado v. United Cable Television of Jeffco, Inc.,* 829 P.2d 1280 (Colo. 1992), *superseded on other grounds by statute,* Ch. 118, sec. 1, § 13-21-111.5(6), 2007 Colo. Sess. Laws 446-48. That provision stated that the indemnitor would "save and hold harmless" the indemnitee "from and against all claims, liabilities, causes of action, or other legal proceedings" for damage or injuries to property or persons "in any way arising out of, connected with or resulting from the exercise by [the indemnitor] of the rights granted" by the contract. *Id.* at 1282 (emphasis omitted). The court observed that the clause referred to

"liabilities" and broadly covered such liabilities "in any way arising out of, connected with or resulting from" the indemnitor's exercise of its contractual rights. *Id.* at 1283.

¶ 69 The Subcontract's indemnity clause does not use the term "liability," but it broadly refers to "claims, damages, losses and expenses" "arising out of, or in connection with" Smith's acts and omissions or contractual breach. The differences in the indemnity clause here and the clause examined in *Public Service* (liability versus "claims, damages, losses and expenses") are not so qualitatively different to persuade us that the two clauses are functionally distinguishable.

¶ 70 Smith's duty to defend was triggered so long as the damaged party (Denver Water) alleged facts even potentially triggering the obligation to indemnify. *See Const. Assocs.*, 930 P.2d at 563; *Cyprus Amax*, 74 P.3d at 299; *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991). Denver Water's complaint did so, alleging that B.C. and Smith failed to identify areas with ACM, thereby causing Denver Water to incur damages. *See Cyprus Amax*, 74 P.3d at 299 (whether the duty to defend is triggered is answered by looking no further than the four corners of the underlying

complaint); *Hecla Mining*, 811 P.2d at 1089-90 (same); *see also Am. Econ. Ins. Co. v. Schoolcraft*, 551 F. Supp. 2d 1235, 1239 (D. Colo. 2007) (the issue is a question of law) (applying Colorado law). Therefore, the district court properly determined, on summary judgment, that Smith had breached its duty to defend B.C.

### 3.    Smith Waived its Conflict-of-Interest Argument

¶ 71    Smith next contends that a conflict of interest existed between Smith and B.C. that prevented it from defending B.C. without risk to its own defenses and that B.C. failed to conduct its defense with "reasonable prudence and due diligence" by failing to present competent testimony to rebut Denver Water's summary judgment motion. Smith argues that reversal is required. This issue was unpreserved for appeal.

¶ 72    Smith never raised a conflict-of-interest issue before trial — it first appeared in Smith's JNOV motion after trial concluded. Smith relies on *Public Service Co. of Colorado v. Osmose Wood Preserving, Inc.*, 813 P.2d 785, 788-89 (Colo. App. 1991), for this position, which approvingly cited section 57(2) of the Restatement (Second) of Judgments:

> If there is a conflict of interest between the indemnitee and the indemnitor regarding the injured person's claim against the indemnitee, so that the indemnitor could not properly have assumed the defense of the indemnitee, a judgment for the injured person precludes the indemnitor only with respect to issues determined in that action as to which:
>
> (a) there was no conflict of interest between the indemnitee and the indemnitor; and
>
> (b) the indemnitee conducted a defense with due diligence and reasonable prudence.

Restatement (Second) of Judgments § 57(2) (Am. L. Inst. 1982).

¶ 73    The Restatement provides that conflicts of interest arise "when the injured person's claim against the indemnitee is such that it could be sustained on different grounds, one of which is within the scope of the indemnitor's obligation to indemnify and another of which is not."  *Id.* § 57(3).

¶ 74    But a conflict-of-interest claim is akin to an affirmative defense or claim for avoidance that Smith should have raised pretrial.  *See* C.R.C.P. 8(c) ("Any mitigating circumstances to reduce the amount of damage shall be affirmatively pleaded."); *see also Town of Carbondale v. GSS Props., LLC*, 169 P.3d 675, 681 (Colo. 2007) ("If a defense is not raised in the answer or through a

31

successful amendment of the answer, it is waived."). Smith had ample opportunity to explain to the court why it could not defend B.C. due to this alleged conflict of interest — most notably when Smith responded to B.C.'s Rule 56(h) motion.

¶ 75 Because Smith had to affirmatively raise this defense, it waived this argument by first raising it in its JNOV motion. *See Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 2016 COA 176M, ¶ 43; *see also Fid. Nat'l Title Co. v. First Am. Title Ins. Co.*, 2013 COA 80, ¶ 51 (a defense raised for the first time in a post-trial motion is not preserved for appellate review).

¶ 76 We therefore decline to review this contention on appeal.

### B. The Indemnification Order was Proper

¶ 77 Smith next argues that the Indemnification Order was improper because (1) Smith did not have adequate notice and an opportunity to respond to Denver Water's motion for summary judgment or present its arguments before the Indemnification Order was entered; (2) the district court erred by imposing an indemnification duty on Smith when the PSJ Order did not address causation; and (3) the Indemnification Order assumed that Smith breached its duty of care while the PSJ Order did not address it,

and the jury impermissibly awarded damages for an unproven breach.

¶ 78　　As explained below, we disagree with each contention.

### 1. Smith Had Adequate Notice and an Opportunity to Respond

¶ 79　　According to Smith, the district court erred by relying on the PSJ Order to grant summary judgment sua sponte in favor of B.C. via the Indemnification Order, denying Smith a chance to present contrary evidence. Smith contends it had insufficient notice and no opportunity to respond. The record refutes this contention.

¶ 80　　True, "[t]o protect the nonmoving party, the trial court must provide an adequate opportunity to present legal argument and to assert contested facts that would render summary judgment inappropriate." *ISG, LLC v. Ark. Valley Ditch Ass'n*, 120 P.3d 724, 730 (Colo. 2005). While Denver Water moved for summary judgment against B.C., not Smith, it did so on the grounds that B.C., via the Smith Report, breached the Prime Agreement. The Report's technical inaccuracy was Denver Water's main argument for partial summary judgment. Smith was a party, and Smith's counsel entered an appearance on May 6, 2021.

¶ 81    Smith also knew that the Subcontract required it to "indemnify, defend and hold [B.C.] harmless" for all claims arising out of a breach by Smith. Smith should have realized that if the court held that B.C. breached the Prime Agreement because of the Smith Report, Smith could readily be found in breach of the Subcontract. And it has never been disputed that the Report was inaccurate because it "missed" ACM areas.

¶ 82    Smith recognized the importance of the Report to its liability. For example, in April 2022, Smith responded to Denver Water's motion for reconsideration concerning the district court's refusal to strike Smith's expert's report, arguing that Smith met the applicable standards of care (rebutting Szynzkie's report). Smith wrote, "[W]hether Smith performed its work accurately is *the* fact in issue in this litigation." Smith also argued that it was "entitled to defend" the allegation that Smith failed to accurately identify ACM at the site, "regardless of the . . . relationships between the parties." And at a March 2022 discovery dispute conference, Smith's counsel announced that it intended to defend its conduct, noting, "I find it very hard to believe that there wasn't an expectation based on the way things are pled . . . that Smith would certainly defend itself and

34

provide evidence to support that it was not negligent in the work that it did, that it met its standard of care." More importantly, in June 2022, in the Duty to Defend Order, the district court found that Smith was obligated to defend B.C.

¶ 83 Thus, Smith had months (from February 2022, when Denver Water filed its motion for partial summary judgment, to December 2022 when the PSJ Order issued) to respond to Denver Water's summary judgment motion, especially after the court ruled that Smith had an obligation to defend B.C. Yet Smith filed no response. Instead, Smith waited until weeks before trial in January 2023 to take advantage of the PSJ Order's ruling against B.C. to try to absolve itself of its own liability. This shows that Smith made an intentional choice — one that ignored its duty to defend B.C. no less.

¶ 84 The district court did not grant B.C. summary judgment sua sponte — it requested briefing on important legal issues ahead of trial. And as the district court noted, the expedited briefing schedule ahead of the Indemnification Order was necessary since no party asked to continue the trial (scheduled to start February 6). Smith had ample opportunity to respond to the district court's

questions, and to respond to B.C.'s arguments, ahead of the Indemnification Order.

¶ 85 The record refutes Smith's contention that it had no adequate opportunity to respond to Denver Water's motion for summary judgment or present its arguments before the Indemnification Order. *See ISG*, 120 P.3d at 730 ("De novo review of the record in summary judgment cases may reveal that the party against whom summary judgment was entered was on notice of the matters of law at issue and had an adequate opportunity to present legal argument and evidence, despite technical irregularities."). The district court did not err.

### 2. The Indemnification Order Did Not Depend on the PSJ Order Establishing Smith's Breach

¶ 86 Next, Smith contends that the Indemnification Order ignored the Subcontract's indemnification language limiting Smith's responsibility for claims "arising out of" its acts or breaches of contract, therefore, requiring causation. Because the PSJ Order did not address causation, Smith contends that the Indemnification Order erroneously concluded that Smith had to indemnify B.C. before its liability was adjudicated.

36

¶ 87    According to Smith, the PSJ Order primarily determined that B.C. breached the Prime Agreement because the Report was inaccurate.  It did not explicitly determine that Smith breached the Subcontract or determine whether the Report's inaccuracy caused Denver Water's damages, leaving the question of those damages for trial.  Smith argues that the PSJ Order did not address Smith's standard of care, whether the Report caused Denver Water's damages, or whether Smith breached the Subcontract.  Thus, the Indemnification Order could not have found, as it did, that the necessary corollary of the PSJ and Duty to Defend Orders was that Smith was obligated to indemnify B.C.

¶ 88    We conclude that the Indemnification Order's outcome was a logical conclusion given the PSJ Order's findings concerning B.C.'s breach of the Prime Agreement, and the resulting implications for Smith's liability.  Indeed, there was no other possible result given the plain language of the Prime Agreement and Subcontract.  *See E. Ridge*, 109 P.3d at 974; *Boulder Plaza*, 198 P.3d at 1221. Consequently, the district court did not err by finding that the Duty to Defend and PSJ Orders' necessary implication was that Smith

breached the Subcontract and, thus, had to indemnify B.C. for damages resulting from the Report's deficiencies.

¶ 89 The Subcontract's indemnification clause provided that Smith "shall indemnify, defend and hold [B.C.] harmless," against "all claims . . . arising out of . . . [a] *breach of contract*" by Smith. (Emphasis added.) Further, the Subcontract provided that B.C.'s obligations to Denver Water "under the Prime Agreement, which are applicable to [Smith's] Scope of Services herein, shall in turn be assumed by [Smith] to [B.C.]" Thus, Smith assumed any obligation B.C. had to Denver Water related to Smith's services, and Smith agreed to defend and indemnify B.C. for any claims arising out of its contractual breaches.

¶ 90 B.C.'s obligations to Denver Water included a "responsib[ility] for the professional quality, technical accuracy, timely completion, and coordination of all studies, *reports* and other Work performed under this Agreement." (Emphasis added.) Therefore, B.C. was obligated to provide Denver Water an accurate report, and Smith, in turn, was obligated to provide B.C. an accurate report under the scope of its services. There is no dispute that the Report was inaccurate by failing to highlight areas containing ACM.

¶ 91    Once the district court found that the Report was inaccurate, and that B.C. breached the Prime Agreement, Smith had then breached the same obligation it contractually assumed.  That the PSJ Order addressed B.C.'s and not Smith's standard of care is largely irrelevant on this point (though we address this point further below) — the Report breached B.C.'s obligations, and Smith's assumed obligations, under the Prime Agreement.  Thus, when the jury determined the damages Denver Water incurred were because of the Report, Smith was obligated to indemnify B.C.

¶ 92    The Indemnification Order found that the necessary corollary of the Duty to Defend and PSJ Orders was that when B.C. breached the Prime Agreement with the Smith Report, it "necessarily followed" that Smith had breached the same obligation.  The plain language of the Prime Agreement and Subcontract support this outcome.  *See E. Ridge*, 109 P.3d at 974; *Boulder Plaza*, 198 P.3d at 1221.  Because Smith was obligated to indemnify B.C. for the resulting damages, the district court did not err.

### 3. Neither the Indemnification Order nor the Jury Instructions Erroneously Assume Smith's Breach of a Standard of Care

¶ 93     Next, Smith contends that because the PSJ Order did not address Smith's standard of care, the resulting Indemnification Order assumed an unproven breach of Smith's standard of care. Smith argues this resulted in jury instructions that improperly informed the jury that it had breached its duty of care and allowed the jury to award damages for either the Report's inaccuracy or the assumed breach of the standard of care. Smith argues this error requires a new trial. We disagree.

¶ 94     "[T]he giving of an erroneous [jury] instruction constitutes reversible error once prejudice is shown." *Walker v. Ford Motor Co.*, 2017 CO 102, ¶ 21 (citation omitted). We "will deem an error harmless, and thus will not reverse a judgment, unless the error resulted in substantial prejudice to a party." *Id.* "A court commits error by giving an incorrect instruction 'unless the error is cured by the instructions as a whole.'" *Brooktree Vill. Homeowners Ass'n v. Brooktree Vill., LLC*, 2020 COA 165, ¶ 51 (citation omitted). Smith preserved this issue for appeal by tendering its own jury instructions. *See In re Estate of Chavez*, 2022 COA 89M, ¶ 20.

¶ 95    Smith specifically highlights that B.C. agreed to conduct its work "with the usual thoroughness and competence and in accordance with generally accepted standards of care of [B.C.'s] profession prevailing in Colorado and utilized by competent engineering firms." The Subcontract, in contrast, provides that Smith's standard of care was that it "shall perform its services with the standard of care, diligence and skill ordinarily exercised by firms providing similar services and in accordance with accepted and sound professional practices and procedures."

¶ 96    Arguing these standards are different, Smith posits that the PSJ Order could not have found that Smith breached its duty of care, and to the extent it did, it contradicted the plain language of the Subcontract. While Smith assumed B.C.'s obligations related to Smith's scope of services, Smith argues that applying B.C.'s standard of care for engineering firms to Smith would lead to an absurd result by placing "a hazardous material assessment firm in the role of an engineer" rendering its own standard of care under the subcontract superfluous.

¶ 97    Smith points to Instructions 7 and 15 as evidence of the harm this allegedly caused.[4]  Instruction 7 provided, in pertinent part,

> The Court has found that [B.C.] breached its contract with Denver Water in two respects: (1) under the Agreement, [B.C.] is responsible for the technical inaccuracy in the Smith Report and has failed to take responsibility for it; and (2) [B.C.] failed to meet the standard of care required under the Agreement with respect to the technical inaccuracy in the Smith Report.
>
> . . . The Court has found that [Smith] breached its Subcontract with [B.C.] due to the technically inaccurate Smith Report and [Smith] failed to meet the standard of care under the Subcontract with respect to the technical inaccuracy in the Smith Report.

¶ 98    Instruction 15, in turn, provided that

> The Court has already determined that [Smith] owes [B.C.] indemnification for any damages awarded to Denver Water against [B.C.] which arise out of or are in connection with [Smith's] breach of its contract with [B.C.] due to the technical inaccuracy contained in the Smith Report and failure to meet the standard of care.

---

[4] Smith also posits that, given the district court's post-trial order, it was plain error for the court to have given Instructions 7 and 15. But plain error review in civil cases — particularly of jury instructions, C.R.C.P. 51 — is necessarily "confined to the most compelling cases," and this is not such a case.  *Robinson v. City & Cnty. of Denver*, 30 P.3d 677, 684-85 (Colo. App. 2000).

¶ 99    Smith contends that these instructions show that the jury was allowed to find that Smith breached some other standard of care in the Subcontract.

¶ 100   To the extent that the Indemnification Order found that Smith breached a standard of care, however, we discern no error.  And, regardless, any such error would have been harmless.

¶ 101   The PSJ Order addressed B.C.'s mirror argument on this point concerning the reference to "competent engineering firms" in the Prime Agreement.  The Prime Agreement did *not* solely hold B.C. to the standard of care applicable to professional engineers because the Prime Agreement encompassed both engineering and non-engineering work.  The parties' intent was that B.C.'s work would be "performed in accordance with any generally accepted *standards* of care (plural) of its profession."  (Emphasis added.)  The plain language of the Prime Agreement supports this interpretation.  *See E. Ridge*, 109 P.3d at 974; *Boulder Plaza*, 198 P.3d at 1221.

¶ 102   The PSJ Order next found that, particularly in light of Denver Water's unrebutted expert testimony, B.C. failed to meet the standard of care "utilized by competent engineering firms in Colorado" *because of the Smith Report.*  Because Smith assumed

B.C.'s obligations vis-a-vis the Smith Report — obligations that did not depend on a standard for professional engineers — when B.C. breached its duty via the Report, so did Smith. And this is precisely why the district court rejected this argument in the Indemnification Order.

¶ 103 Even if this was error, it would be harmless because, considering the jury instructions as a whole, Smith was not substantially prejudiced. *See Walker*, ¶ 21; *see also Brooktree*, ¶ 51. The jury instructions overwhelmingly directed the jury's attention to the key breach Smith committed — producing the inaccurate Report.

¶ 104 Instruction 7 explains that Smith breached the Subcontract because of the "technically inaccurate Smith Report and *[Smith] failed to meet the standard of care under the Subcontract with respect to the technical inaccuracy in the Smith Report.*" (Emphasis added.) And Instruction 15 adds that Smith must indemnify B.C. for damages arising "out of or . . . in connection with [Smith's] breach of its contract with [B.C.] *due to the technical inaccuracy contained in the Smith Report and failure to meet the standard of care.*" (Emphasis added.) These instructions are not telling the

jury to find that Smith breached an alternative duty of care under the Subcontract — the breach concerned only the Report's inaccuracy.

¶ 105 The instructions do indicate that a possible breach of Smith's standard of care is an alternative to a breach for the technical inaccuracy (though, as detailed above, this is not error). For example, Instruction 15 provides that if the jury found Denver Water was entitled to general damages from B.C. it also had to determine if (1) those damages arose from the technical inaccuracy in the Smith Report, and (2) the damages were the "natural and probable consequence" of the Report's inaccuracy. If the jury found both conditions proven, then it was required to award B.C. damages "which arise out of or . . . in connection with [Smith's] breach of its contract with [B.C.] due to the technical inaccuracy contained in the Smith Report *or* failure to meet the standard of care." (Emphasis added.)

¶ 106 But Instruction 15 required the jury to only award B.C. general damages if it found by a preponderance of the evidence that "the damages you have awarded to Denver Water against [B.C.]

45

arose out of or in connection with the technical inaccuracy contained in the Smith Report."

¶ 107    As a result, the only issues the jury decided concerned B.C.'s and Smith's breaches as a result of the Smith Report — not Smith's other breaches of the standard of care.  Even if an error occurred with the jury instructions, when read as a whole, the instructions did not substantively prejudice Smith, and any error was harmless.  *See Walker*, ¶ 21; *see also Brooktree*, ¶ 51.

C.    The District Court Erroneously Excluded Smith's Proffered Causation Evidence, but the Error Was Harmless

¶ 108    Smith next contends that the district court erred by excluding proffered evidence that would have shown that the Smith Report warned of transite at a specific location along the NW wall.  Smith argues that the excluded evidence would have refuted evidence that the Report's inaccuracy caused Denver Water's damages.  Although we conclude the court erred by excluding the evidence, we affirm because the error was harmless.

1.    Additional Facts

¶ 109    The challenged ruling occurred during Smith's cross-examination of Robert Mahoney, Denver Water's chief engineering

officer. Displaying the ACM Diagram, Smith's counsel inquired as to whether the ACM Diagram included a red box — identifying ACM — around the reservoir's NW wall. He then asked, "On the far left of this drawing that's within the red box, do you see up in the upper left-hand corner where it says '[NW] wall?'" Directing Mahoney to Section B, counsel asked if "the area on the far right that's boxed in red actually belongs in the drawing on the [NW] wall?" The reproduced ACM Diagram is below with references to Section B enlarged and relevant language highlighted.



¶ 110 Denver Water objected. The court sustained the objection, reasoning that the evidence went to liability, not damages or causation, and that it "would prove the opposite of what Judge [Myers] found, which was that there should have been a red box there."

### 2. Preservation and Standard of Review

¶ 111 B.C. argues that Smith did not preserve this argument. We disagree. Without explaining its argument, B.C. contends that Smith's offer of proof did not specify the relevance and admissibility of Mahoney's testimony.[5]

¶ 112 To preserve an objection to excluded evidence, a party's offer of proof must show the evidence's relevance and admissibility. *Vu v. Fouts*, 924 P.2d 1129, 1131 (Colo. App. 1996). If a party raised "the sum and substance of the argument it now makes on appeal," the argument is preserved. *Madalena v. Zurich Am. Ins. Co.*, 2023 COA 32, ¶ 50 (citation omitted); *see also* CRE 103(a)(2).

---

[5] B.C. cites the district court's denial of Smith's C.R.C.P. 59 motion for a new trial, wherein the court found that "Smith never made a factual proffer about testimony it would have elicited." We need not defer to this finding because we review preservation rulings de novo. *See In re Estate of Ramstetter*, 2016 COA 81, ¶ 65.

¶ 113 Smith's counsel first explained that the evidence "shows that the area [where] they claim a spill occurred . . . is boxed in red to warn them that there's transite there . . . . [T]hey should have known there was transite" in the spill area. Smith's counsel further argued that "[t]his [evidence] goes directly towards damages," and B.C.'s counsel added, "[I]t goes to causation, which is still open game."[6] When the court asked how the evidence pertained to causation, Smith's counsel explained that "it proves that they should have known if in fact it was true, [transite] was at the [NW] wall," and "it will absolutely prove that there is no causation."

¶ 114 On appeal, Smith raises the same argument about damages and causation. In addition to the above exchange, Smith moved for a new trial, arguing that the court improperly excluded this evidence. This is adequate preservation.

¶ 115 We review a district court's exclusion of evidence for an abuse of discretion. *Wolven v. Velez*, 2024 COA 8, ¶ 9. A district court abuses its discretion when its decision is "manifestly arbitrary,

---

[6] Despite siding with Smith at trial, B.C. changed its position on appeal and now argues that the court properly excluded the evidence.

unreasonable, or unfair." *Id.* (citation omitted). We review de novo whether an evidentiary ruling misapplied the law. *Id.* (citation omitted). Finally, absent clear error, we defer to a district court's factual findings. *French v. Centura Health Corp.*, 2022 CO 20, ¶ 24. Clear error occurs if the finding "lacks support in the record" or leaves us, "after a review of the entire evidence, with the firm and definite conviction that a mistake has been made." *Briargate at Seventeenth Ave. Owners Ass'n v. Nelson*, 2021 COA 78M, ¶ 18 n.3 (citation omitted).

### 3. The Relevant Evidence Did Not Contradict the PSJ Order

#### a. Applicable Law

¶ 116   In Colorado, a plaintiff asserting breach of contract must prove four elements by a preponderance of the evidence: (1) a valid contract existed; (2) the plaintiff performed or justifiably failed to perform under the contract; (3) the defendant failed to perform under the contract; and (4) the defendant's failure to perform caused the plaintiff's damages. *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 46. We consider the fourth element, causation, here.

¶ 117   Although "proof of actual damages is not an essential element of a claim for breach of contract," *Overland Dev. Co. v. Marston*

*Slopes Dev. Co.*, 773 P.2d 1112, 1114 (Colo. App. 1989), recovering actual damages requires proof that the plaintiff "suffered a loss *resulting from* the defendant's actions," *Isaac v. Am. Heritage Bank & Tr. Co.*, 675 P.2d 742, 745 (Colo. 1984) (emphasis added). The plaintiff must offer "evidence of both the existence and the cause of damages," such that the damages are "traceable to and the direct result of the wrong sought to be redressed." *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 477-78 (Colo. App. 2003) (citation omitted).

¶ 118    Once a plaintiff establishes a prima facie breach of contract case, a defendant may present evidence to rebut the plaintiff's claim. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). To be admissible, the rebuttal evidence must be relevant, *see* CRE 402, meaning it "tends to prove or disprove a fact in issue," *In re Marriage of Turilli*, 2021 COA 151, ¶ 13.

### b.    Analysis

¶ 119    B.C. argues that Smith's proffered evidence was inadmissible because it did not pertain to disputed facts and contradicted the PSJ Order. Granting partial summary judgment, the district court found for Denver Water on the first three elements of its breach of

contract claim. On the third element, failure to perform, the court held that the Smith Report's technical inaccuracies constituted a breach. Specifically, it found the Report technically inaccurate for "includ[ing] an annotated construction drawing with red boxes that depict areas containing assumed ACM when the same annotated drawing fails to depict red boxes for equally identifiable areas with assumed ACM." The fourth element, "whether Denver Water was *damaged as a result* of this breach . . . remain[ed] a contested issue for trial." (Emphasis added.)

¶ 120   Before Denver Water was dismissed from this appeal by stipulation, it cited the district court's factual finding that the Report did not include a red box highlighting "assumed ACM along the [SW] wall. Other original construction drawings also show the location of this transite, including along the [NW] wall. The location of this transite was not specifically called out as assumed ACM anywhere in the Smith Report." Denver Water argued that Smith's attempt to offer evidence of a red box around Section B contradicted the court's conclusion that the Report failed to identify transite at that wall. Smith responded that the court's finding pertained only

to the SW wall and that it made no specific findings about the NW wall or Section B.

¶ 121 For several reasons, we conclude that the court erroneously excluded this evidence. First, while the above-cited language, in isolation, suggests that the court was referring to missed transite at the NW wall, in context that is less clear:

> Mr. Keyes failed to specifically identify additional transite . . . along the [SW] wall . . . . [He] testified . . . that *this* reference to transite is something that he "missed". . . . [A] red box was not added . . . to highlight *this* finding of assumed ACM along the [SW] wall. Other original construction drawings also show the location of *this* transite, including along the [NW] wall. The location of *this* transite was not specifically called out . . . anywhere in the Smith Report. . . . While the Smith Report did not specifically identify *this* transite, [it] also did not state that areas [without red boxes] were free of ACM or suspected ACM.

(Emphases added.)

¶ 122 The court repeatedly referenced "this" transite without clarifying exactly which transite it meant. Because the preceding sentence explicitly called out the SW wall, it is at least plausible that the court's reference to "this transite" along the NW wall referred to transite on the SW wall that abuts, but is not on, the NW

wall. It is similarly unclear whether the court's reference to the NW wall included Section B or only pertained to the ACM Diagram's larger image of the wall.

¶ 123   Further, the above-quoted portion of the court's order is from its factual findings. In the analysis section, the court ruled that the Smith Report was technically inaccurate and therefore constituted a breach, because it identified some assumed ACM and missed other "equally identifiable areas with assumed ACM." We understand the court's legal conclusion to be that the general failure to identify some assumed ACM resulted in a breach, not that the damages resulted from specific unidentified transite.

¶ 124   We hesitate to conclude that the PSJ Order explicitly found the Report inaccurate for failing to identify suspected ACM on the NW wall given the red box around Section B, clearly referencing the NW wall. If the district court found that the Report failed to identify possible ACM at the NW wall, that finding would lack record support and is not entitled to deference. *See French,* ¶ 24.

¶ 125    Moreover, Smith did not offer the challenged evidence to dispute the court's ruling that the Report was inaccurate.[7]  Rather than disputing the Report's accuracy, Smith argued that the Report, regardless of its inaccuracies, did not cause the asbestos spill or Denver Water's damages.  Finally, the fact that the Report's mistakes established a contractual breach did not preclude arguments at trial about those inaccuracies when a key remaining issue was whether they caused Denver Water's damages.  Therefore, Smith's attempt to highlight the red box around the NW wall as depicted in Section B did not directly contradict the PSJ Order.

¶ 126    Second, this evidence was relevant to "whether Denver Water was damaged as a result of [the] breach," which was "a contested issue for trial."  The district court misapplied the law when it reached a contrary conclusion.  Specifically, the court found that the proffered evidence "goes towards liability" rather than damages

---

[7] In denying Smith's Rule 59 motion, the court construed Smith's proffer as an attempt to argue that "the Smith Report was not technically inaccurate because Denver Water should have known that transite existed on the [NW] wall despite there not being a red box calling it out."  We disagree.  Smith attempted to show that, regardless of other inaccuracies, there *was* a red box calling out ACM at the NW wall.

and said, "It's not a negligence claim," in response to B.C. and Smith's argument that the evidence went to causation.

¶ 127    In so holding, the court conflated liability for breach with liability for damages. Whether the Smith Report's inaccuracies constituted a contractual breach and whether they caused Denver Water's damages are different issues. *See Overland*, 773 P.2d at 1114 (finding a breach does not support an actual damages award absent proof of causation). The court's reference to negligence also suggests that it did not view causation as a required element. To recover more than nominal damages, Denver Water had to prove that its loss resulted from the breach — i.e., the Report's inaccuracy. *See Isaac*, 675 P.2d at 745.

¶ 128    If the spill occurred at the NW wall, and if the Report warned of ACM at that specific location, Smith's evidence was relevant because it tended to disprove the disputed causation. *See Turilli*, ¶ 13. Denver Water had to prove that the breach *caused* its damages.[8] *See Centric-Jones Constructors*, 100 P.3d at 478. Smith,

---

[8] The jury instructions reflect this burden. To award general (rather than nominal) damages, the jury had to find that Denver Water's damages were "the natural and probable consequence of" the Smith Report's technical inaccuracy.

in turn, could seek to rebut *causation*. *See Diodosio*, 841 P.2d at 1058. The court's ruling excluding this evidence rested on a misinterpretation of the law and was therefore erroneous. *See Wolven*, ¶ 9.

### 4. The Evidence was not Inadmissible under CRE 403

¶ 129 Relevant evidence is not automatically admissible. Instead, otherwise relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of," as pertinent here, "confusion of the issues, or misleading the jury, . . . or needless presentation of cumulative evidence." CRE 403. However, because the rules strongly favor admission, we afford evidence "its maximal probative weight and its minimal prejudicial effect." *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 19.

¶ 130 Here, B.C. argues that the excluded evidence was cumulative of Smith's other attempts to rebut causation. Smith refutes this contention, arguing that it was unable to present any evidence about Section B or that the Report specifically warned of transite at the NW wall. The challenged evidence was not so needlessly cumulative as to warrant exclusion under CRE 403. However, because Smith had various opportunities to show that the Report

warned of possible ACM at or near the spill's location, we conclude that the evidence's exclusion was harmless.

¶ 131 The record reflects confusion about the spill's location. When Smith questioned Mahoney about Denver Water initially reporting the spill at the NE corner, Mahoney said, "[O]ne person calls it [NE] corner and one calls it a [NW] corner, yet it doesn't mean your terminology is the same." Similarly, Bowers testified that he and his supervisor "had difficulty understanding the orientation of this site. He was often confused of the locations," and his supervisor often "refer[red] to one side that was incorrect." There was also conflicting evidence about whether the spill occurred at the NW-NE corner or the NW-SW corner.

¶ 132 While we do not weigh conflicting evidence, *see Luster v. Brinkman*, 205 P.3d 410, 415 (Colo. App. 2008), this confusion helps persuade us that the court's error in excluding the evidence was harmless. Given the discrepancies concerning whether the spill occurred at the NE or NW walls, Smith's original strategy was to suggest that the Smith Report warned of transite at both locations. After the court excluded the challenged evidence, Smith pivoted to suggesting that (1) the spill occurred at the NE wall,

which was boxed in red; or (2) if the spill was at the NW wall, the Report's general warnings about suspected ACM challenged causation.

¶ 133 Smith "presented considerable evidence . . . in its attempt to convince the jury that the asbestos spill fell within one of the red boxes." Despite discrepancies about whether the spill occurred at the *NE* wall or the Report warned of suspect ACM at the *NW* wall, other evidence largely suggested that the spill was at the NW wall.

¶ 134 While the court did not allow Smith to offer evidence of a specific warning of ACM at the NW wall, it allowed some evidence that the Report generally warned of ACM at that wall. For example, on cross-examination, Bowers confirmed that the Report noted "the potential for additional suspect materials to also be present underground." Smith's counsel then asked if this language "indicated that there would be other areas of transite buried . . . [including at] the [NW] wall?" After the court overruled Denver Water's objection, Smith's counsel asked whether the Report's language meant that ACM could be anywhere at the project site, including the NW wall, and Bowers agreed. The general warnings were not necessarily cumulative of Section B's specific warning, but

Smith was not entirely precluded from arguing that the Report warned of ACM at the NW wall. Additionally, given the confusion about the spill's location, Smith offered an alternative argument that the spill occurred within the red box at the NE wall.

¶ 135    Finally, the testimony Smith sought to elicit would not have confused or misled the jury. *See* CRE 403. A limiting instruction could mitigate any danger of misleading the jury about Smith's liability for failing to identify suspected ACM in the Report.[9] That Section B warned of ACM at the NW wall does not negate the Report's other inaccuracies. Denver Water could argue that the Report's failure to place a red box around *all* references to the NW wall was an inaccuracy that caused its damages. The proffered evidence also would not have been confusing, particularly considering the evidence Denver Water presented. For example, on redirect examination, Bowers answered "no" to each of the following questions:

¶ 136    Q: "Is there a box around the [NW] wall?"

---

[9] The instruction on damages and causation could clarify that evidence disproving causation negates actual damages only, not liability for the technical inaccuracies and breach.

¶ 137   Q: "Is there a red box around the areas where the potholes indicated that transite had been disturbed?"

¶ 138   Q: "Do you have any reason to believe that transite was disturbed within the red boxes?"

¶ 139   Similarly, Szynskie agreed that the Smith Report "fail[ed] to identify transite at the footer of the [NW] wall" and that, if transite had been disturbed there, asbestos "was not identified in any of the materials provided by [B.C]."  We do not see how evidence refuting Bowers's and Szynskie's testimony would confuse the jury.  *See Diodosio*, 841 P.2d at 1058.  Because Smith's evidence was probative of causation and any possible prejudice was slight, exclusion under Rule 403 was not warranted.  *See Murray*, ¶ 19.  Nevertheless, the fact that the challenged evidence was excluded does not require reversal.

### 5.   The Error Was Harmless

¶ 140   We reverse erroneous evidentiary rulings only if the error is not harmless.  *Id.* at ¶ 56.  We cannot say that the district court's erroneous exclusion of Smith's proffered evidence "substantially influenced the outcome of the case."  *Id.* (citation omitted).  As noted, Smith was able to argue that the Report's inaccuracies did

not cause Denver Water's damages. And, even if Smith had introduced testimony concerning the red box around Section B and connected this to part of the NW wall, we cannot say that the jury would have found a lack of causation.

¶ 141 First, because it is unclear which parts of the NW wall Section B depicts, and because the evidence was unclear as to where exactly the spill occurred, the red box may not have included the part of the wall where the spill supposedly occurred. Second, there was no red box around the largest and most obvious image of the NW wall in the ACM Diagram. The jury heard evidence that there was transite "going around the walls of the reservoir." Thus, even if the court had admitted Smith's proffered evidence, the jury could have found that failing to also place a red box around most of the NW wall was an inaccuracy that caused Denver Water's damages.

¶ 142 We also note that no party has appealed the judgment against B.C. in favor of Denver Water. That judgment obligated B.C. to pay for any damages found to be attributable to the Smith Report, regardless of any separate argument Smith might have made about causation on its own behalf.

¶ 143     Although the district court erred by excluding the proffered evidence, we affirm because the error was harmless.

### D.     The Amended Duty to Defend Judgment was Proper

¶ 144     Smith's final challenge is that that the district court erred when it amended the duty to defend judgment to add a "new category of damages." Following trial, as relevant here, the district court issued an indemnification judgment in B.C.'s favor on March 2, 2023, and a duty to defend judgment on April 28, 2023.

¶ 145     B.C. asked, pursuant to C.R.C.P. 59(a), that the court amend the April 28 judgment to include the costs awarded to Denver Water against B.C. Despite Smith's opposition, the court amended that judgment to include $323,010.07 of the costs it had awarded to Denver Water. Smith now challenges that award.

¶ 146     According to Smith, Rule 59 — whose purpose is to give the court an opportunity to correct its own mistakes — is not the appropriate vehicle for the court to entertain B.C.'s untimely request for a new category of damages (related to Smith's indemnification duties), especially when B.C. had ample opportunity to request those damages earlier in the case. B.C. disagrees with Smith's characterization of its request and urges us

to conclude that the district court acted entirely within its discretion in amending the April 28 duty to defend judgment.

### 1. Standard of Review and Legal Framework

¶ 147 We review a district court's decision to amend findings under Rule 59 for abuse of discretion. *Skyland Metro. Dist. v. Mountain W. Enter., LLC*, 184 P.3d 106, 115 (Colo. App. 2007).

¶ 148 A party seeking relief under Rule 59(a) must file a timely request for that relief. *Schuster v. Zwicker*, 659 P.2d 687, 689 (Colo. 1983) (recognizing that a court may not enlarge the time to file if the request is not filed within the period specified in the rule); *accord Przekurat v. Torres*, 2016 COA 177, ¶ 52, *aff'd*, 2018 CO 69.

### 2. Denver Water's Fees and Costs

¶ 149 The April 28 duty to defend judgment consisted of B.C.'s attorney fees and costs incurred in defending against Denver Water's claims (totaling $942,717.94). B.C. promptly requested an extension of time to address the April 28 duty to defend judgment (which the court granted) and then timely requested, from Smith,

$323,010.37 of the costs the court had awarded to Denver Water (from B.C.) on April 6, 2023.[10]

¶ 150    The court later issued an order, dated May 23, 2023, amending the March 2 and April 28 judgments as follows:

| Judgment Date | Damage Category | Amount |
|---|---|---|
| March 2 | Jury verdict | $999,352.86 |
| March 2 | Prejudgment interest | $262,559.20 |
| March 2 | Postjudgment interest | $276.58/day |
| April 28 | Attorney fees & costs | $942,717.94 |
| April 28 | Prejudgment interest | $69,143.02 |
| April 28 | Postjudgment interest | $292.57/day |
| April 28 | Denver Water's costs | $323,010.37 |

¶ 151    According to Smith, per Rule 59(a)(4), B.C. could not ask the district court to amend the March 2 duty to indemnify judgment after March 16, 2023, and B.C. had until May 2, 2023, to seek any amendment to the April 28 duty to defend judgment.  But until the court awarded costs to Denver Water (on April 6), B.C. could not request a specific amount from Smith as covered by the

---

[10] B.C. calculated its "proportionate share" of Denver Water's costs to be $323,010.37, presumably to reflect that the jury allocated some responsibility to B.C., given the difference in the verdict against B.C. versus the verdict against Smith.  Denver Water requested and was awarded $403,762.97.  Of that total, $330,647.17 was for Denver Water's experts.

65

Subcontract's indemnity clause (admittedly, B.C. could have requested the category of damages with the amount to be later determined).

¶ 152 In any event, B.C. was granted until May 12, 2023, to file its Rule 59 motion, and B.C. met the court's extended deadline. All three parties filed a flurry of post-trial motions soon after the verdict was entered, and the district court did an admirable job in addressing the various claims of error and damage adjustments.[11] Because the district court had broad discretion to grant the requested extension, *see Schuster*, 659 P.2d at 689, we cannot say its amendments were improper.

---

[11] Had Smith timely assumed the duty to defend (with or without a reservation of rights), it could have assumed control over the course of the litigation and availed itself, as it later suggested B.C. should have done, of exploring a reasonable settlement before all parties expended the enormous resources they did. *See, e.g.*, *Advanced Ground Sys. Eng'g, Inc. v. RTW Indus., Inc.*, 388 F.3d 1036, 1041 (7th Cir. 2004) (recognizing that an indemnitor has the choice of defending under a reservation of rights or staying "out of the lawsuit," thus gambling "that its interpretation of the scope of the indemnity clause" will prevail; and, if it loses the gamble, it is responsible not only for the defense costs, but also for the sums the indemnitee must pay). The duty to defend serves, in part, to avoid, or at least minimize, liability before it is established. *See Certain Underwriters at Lloyd's of London v. Superior Ct.*, 16 P.3d 94, 101 (Cal. 2001); *Nitto v. Fairbrother*, No. 20-CV-6660-MJP, 2023 WL 2142146, at *14 (W.D.N.Y. Feb. 21, 2023) (unpublished order).

## E.    B.C.'s Cross-Appeal

¶ 153    B.C.'s cross-appeal argues that the district court erred in allowing the jury — not the court — to decide its indemnification claim against Smith.  B.C. argues that the district court should have entered judgment as a matter of law that B.C. is entitled to damages against Smith equaling the full amount of damages that were awarded to Denver Water and that it is entitled to 100% of the costs and interests awarded to Denver Water (rather than a proportionate share as detailed above in Part V.D).

¶ 154    Smith counters that Denver Water reserved its right to pursue additional breaches by B.C.  And, because the jury heard evidence of, and reached a verdict concerning, B.C.'s additional breaches, Denver Water was entitled to all its proven damages.

¶ 155    It is true that at various points in the case, including at the very beginning of trial, Denver Water unequivocally expressed its intent to proceed on its theory that B.C. committed "other breaches" not included in the PSJ Order.  But Denver Water later affirmatively gave notice that it was only advancing the breach for the technical inaccuracy of the Report that was the subject of the PSJ Order.  Denver Water repeated its position in the verdict form it and B.C.

67

submitted jointly, "Denver Water no longer intends to seek[] a finding of liability from the jury on the alleged additional breaches of contract." Rather, Denver Water and B.C. agreed that any arguments on other breaches would relate only to causation. The joint proposed verdict form read as follows:

> To the Jury: You are instructed to answer the following questions. You must apply the law in the instructions that the Court gave you to the facts that were proved by the evidence. You must all agree on your answer to each question and you must all sign the completed form on the signature lines.
>
> We, the jury, present our Answers to the following Questions submitted by the Court, to which we have all agreed:
>
> I. Denver Water's Claim Against [B.C.]
>
> QUESTION NO. 1: State the total amount of damages you decide should be awarded to Denver Water for its claim against [B.C.]:
>
> AMOUNT: _____
>
> II. [B.C.]'s Claim Against [Smith]
>
> QUESTION NO. 2: State the total amount of damages you decide should be awarded to [B.C.] for its claim against [Smith]:
>
> AMOUNT: _____

68

¶ 156    While the jury awarded more damages against B.C. than against Smith, the parties created the opportunity for the jury to do so based on the evidence they presented and their closing arguments. Their supposedly "simplified" (and stipulated) verdict form confused the jury about how to reconcile the different lines for damages against B.C. and against Smith, given the language of Instruction 7.

¶ 157    That instruction informed the jury that B.C. had breached its contract with Denver Water in two respects: (1) B.C. was "responsible for the technical inaccuracy of the Smith Report and has failed to take responsibility for it," and (2) B.C. failed to "meet the standard of care under the Agreement with respect to the technical inaccuracy in the Smith Report." The jury also learned that Smith breached its subcontract with B.C. due to the "technically inaccurate" Report and by failing to "meet the standard of care" with respect to the inaccuracy.

¶ 158    During trial, Denver Water argued that B.C. had opportunities to correct Smith's error, including as part of its quality control obligation. In closing argument, Denver Water and Smith argued

about B.C.'s other breaches.[12]  But the jury was never asked, as a *prior* draft jury instruction (later withdrawn) did — to specify whether B.C. committed other breaches vis-a-vis Denver Water.  To be sure, Denver Water's concession simplified the trial and the jury's duty.  But after Denver Water's strategic choice and B.C.'s acquiescence in that choice, the district court cannot be faulted for not requiring the jury to more clearly delineate who caused which of the damages Denver Water requested.

¶ 159    Having stipulated to the final jury instructions and verdict forms, B.C. cannot now ask this court to untangle the jury's verdicts.  *See Morales v. Golston*, 141 P.3d 901, 904-05 (Colo. App. 2005) (the failure to object to an alleged inconsistency in the jury's verdict before the jury was dismissed waived a subsequent challenge).  The parties' closing arguments are, perhaps, the best indication of what the jury was asked to do.  For example, B.C.

---

[12] Denver Water's opening statement identified other ways in which B.C. failed to meet its obligations to it, including by, in preparing for ACM abatement, failing to exercise the agreed-upon quality control obligations and by disregarding the project management plan.  Of course, opening statements do not equal evidence, and Denver Water later withdrew its original request to have the jury instructed on B.C.'s "other breaches."

urged the jury to look at Denver Water's own conduct (e.g., the delay in notifying B.C. and not allowing B.C. to help with the remediation). Smith suggested to the jury that B.C.'s contribution to the demolition plan (without Smith's involvement) presented it with an opportunity to course correct. Given this record, the jury very well could have heeded these suggestions. *See Rodriguez v. Morgan Cnty. R.E.A., Inc.*, 878 P.2d 77, 82 (Colo. App. 1994) (a jury verdict will not be reversed for inconsistency if a reading of record reveals any basis for the verdict).

### F. Attorney Fees

¶ 160 B.C. invokes C.A.R. 39.1 and section VIII of the Subontract as the basis for its attorney fees request. Where a contract allows attorney fees and the requesting party explains the legal and factual basis for the award, we may award appellate attorney fees. *See Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 530 (Colo. App. 2011). Because the district court recognized, and this court affirmed, Smith's duties to defend and to indemnify, B.C. is entitled to the fees it incurred in defending Smith's appeal. *See* C.A.R. 39(a)(2). We exercise our discretion pursuant to C.A.R. 39.1 and remand the

71

case to the district court to determine an award of reasonable appellate attorney fees.

## VI.  Disposition

¶ 161     The district court's judgment is affirmed.  We remand the case so the district court may determine an appropriate award of reasonable appellate attorney fees in accordance with this opinion.

JUDGE SCHOCK and JUDGE BERNARD concur.